[Crim. No. 9005. First Dist., Div. One. Feb. 1, 1971.]

In re VINCENT MARTIN MANNINO on Habeas Corpus.

## Counsel

Robert G. Parker and Paul N. Halvonik for Petitioner.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Derald E. Granberg, Sanford Svetcov, Edward P. O'Brien and John T. Murphy, Deputy Attorneys General, for Respondent.

## Opinion

**SIMS, J.**—By his petition for habeas corpus the petitioner seeks a judgment declaring that certain conditions upon which he was granted probation are void, and releasing him from all custody and obligations under those conditions.[1] He contends (1) that the state may not grant the privilege

---

[1] "If . . . the defendant accepts probation, he may seek relief from the restraint of any alleged invalid condition of probation on appeal from the order granting probation or on habeas corpus. [Citations.]" (*In re Bushman* (1970) 1 Cal.3d 767, 776 [83 Cal.Rptr. 375, 463 P.2d 727]. See also *In re Allen* (1969) 71 Cal.2d 388, 389 [78 Cal.Rptr. 207, 455 P.2d 143]; and *In re Osslo* (1958) 51 Cal.2d 371, 376 [334 P.2d 1] [cert. den. (1958) 357 U.S. 907 (2 L.Ed.2d 1157, 78 S.Ct. 1152)].)

of probation on conditions requiring the relinquishment of First Amendment rights, (2) that the complained of conditions of probation are an unconstitutional prior restraint on free speech, (3) that those conditions are unreasonable and excessive in the light of California probation law, and (4) that those conditions constitute an unconstitutional infringement of First Amendment rights of petitioner's potential audience.

For reasons hereinafter set forth it is determined that many of the conditions in question exceed the criteria prescribed by law for terms of probation, and are therefore invalid; and that insofar as the remaining conditions impinge on freedom guaranteed by the United States Constitution they are warranted, because of the status of the petitioner as a convicted felon, as conditions, which are reasonably related and sufficiently narrowly drawn, to serve the interest of the state in providing for the reform and rehabilitation of the petitioner. The writ must be granted to the extent that the trial court must be ordered to revise its order in accordance with the views expressed in this opinion.

Attached to the petition are a copy of a judgment and commitment to the county jail, copy of minutes of the court, bearing date of November 5, 1969, which contain the conditions of which the petitioner complains,[2] and a memorandum decision of the court dated March 30, 1970 denying the petitioner's petition to modify the terms and conditions of his probation. In their return to an order to show cause issued by this court the People adopted by reference a copy of a probation report dated September 3, 1969 and a copy of the transcript of the sentencing proceedings held November 5, 1969, both of which had previously been lodged with this court.

---

[2]These conditions, numbered as referred to by the petitioner, read as follows:
[3]. "He shall, during the period of probation, not become a member, either actively or passively, of any political or other organization, either on or off campus that participates in or advocates any form of protest or change in existing conditions, except that he may become a member of the authorized student body organization on the campus where he is currently enrolled, provided that he shall not participate in any activity of the student body organization, advocating any form of protest or change in existing condition. He shall, during the period of probation, not contribute any newspaper articles or other writings to any publication, official or unofficial, of any college, high school, junior high school, campus or any other publication, nor shall he be an editor of, advisor to, or otherwise participate in any campus or off campus publication; nor shall probationer use a fictitious name or the identity of another person for the purpose of doing any of the foregoing. He shall not, during the period of probation, speak for any organization on any college, high school, or junior high school campus or at any public function. He shall not, during the period of probation, be present on any college, high school, or junior high school campus where he is not currently enrolled except for official courses, or other purpose specifically authorized by the school that he is attending."
[5]. "He shall not participate in, actively or passively, nor shall he be an advisor to any on-campus or off-campus demonstration for any purpose whatsoever."

From the foregoing it appears that on August 1, 1969 after a jury trial, the petitioner was found guilty of assault with force likely to produce great bodily harm in violation of section 245 of the Penal Code; that the matter was referred to the probation officer for a report; and that subsequently, presumably after the receipt of the probation officer's report dated September 3, 1969, the petitioner was referred to the Department of Corrections under the provisions of section 1203.03 of the Penal Code for diagnosis and recommendation; and that on November 5, 1969, following his return to court for sentencing, he was sentenced to state prison for the term prescribed by law, execution of sentence was suspended, and defendant was granted probation for a term of five years on the following conditions, in addition to those which have been noted in the margin: first, that he serve six months in the county jail with credit for time served with the Department of Corrections under the section 1203.03 order; second, that "he shall, during the period of probation, attend an accredited school or university taking at least 12 semester units or equivalent quarter units each semester or quarter enrolled, for at least 2 semesters or 3 quarters per year, commencing not later than the fall 1970 semester and continuing until a bachelor's degree is obtained"; and third, "He shall make restitution to the victim in the amount to be determined by the probation officer and to be paid thru the probation officer."

## I

"When granting probation, courts have broad discretion to impose restrictive conditions to foster rehabilitation and to protect public safety. Penal Code section 1203.1 authorizes the court to impose any 'reasonable conditions, as it may determine are fitting and proper to the end that justice may be done, . . . and specifically for the reformation and rehabilitation of the probationer.' " (*In re Bushman* (1970) 1 Cal.3d 767, 776 [83 Cal.Rptr. 375, 463 P.2d 727]. See also *In re Allen* (1969) 71 Cal.2d 388, 390 and 393 [78 Cal.Rptr. 207, 455 P.2d 143]; *People* v. *Osslo* (1958) 50 Cal.2d 75, 103 [323 P.2d 397]; *People* v. *King* (1968) 267 Cal.App.2d 814, 822 [73 Cal.Rptr. 440] [cert. den. (1970) 396 U.S. 1028 [24 L.Ed.2d 524, 90 S.Ct. 576]; *In re Peeler* (1968) 266 Cal.App.2d 483, 488-489 [72 Cal.Rptr. 254]; *People* v. *Kern* (1968) 264 Cal.App.2d 962, 964-965 [71 Cal.Rptr. 105]; *People* v. *Dominguez* (1967) 256 Cal.App.2d 623, 626-627 [64 Cal.Rptr. 290]; and *People* v. *Bresin* (1966) 245 Cal.App.2d 232, 240 [53 Cal.Rptr. 687].)

"The appellate courts of this state have had occasion repeatedly to emphasize that a defendant has no right to be granted probation; probation is a privilege, an act of grace or clemency. [Citations.]" (*In re Osslo* (1958) 51 Cal.2d 371, 377 [334 P.2d 1]. See also, *People* v. *King, supra,*

267 Cal.App.2d 814, 822; and *In re Peeler, supra,* 266 Cal.App.2d 483, 489.) It is also generally stated, "If the defendant considers the conditions of probation more harsh than the sentence the court would otherwise impose, he has the right to refuse probation and undergo the sentence. [Citations.]" *(In re Bushman, supra,* 1 Cal.3d 767, 776. See also *In re Osslo, supra,* 51 Cal.2d 371, 381; *People* v. *Osslo, supra,* 50 Cal.2d 75, 103; *People* v. *King, supra,* 267 Cal.App.2d 814, 826; *People* v. *Kern, supra,* 264 Cal.App.2d 962, 965; *People* v. *Williams* (1966) 247 Cal. App.2d 394, 403-404 [55 Cal.Rptr. 550]; and *People* v. *Bresin, supra,* 245 Cal.App.2d 232, 240.)

It is sometimes suggested that the principle that the convicted defendant has the right to refuse probation and suffer his sentence renders him powerless to attack any condition of probation which he has accepted.[3] An examination of the cases last cited in the text indicates that in each case the term of probation under attack was expressly found to be reasonable or proper when it was upheld. (See, *People* v. *Osslo, supra,* 50 Cal.2d at p. 103; *People* v. *King, supra,* 267 Cal.App.2d at pp. 823-824; *People* v. *Kern, supra,* 264 Cal.App.2d at p. 965; and *People* v. *Bresin, supra,* 245 Cal.App.2d at p. 240.) Moreover, it has often been recognized that if the sentencing court has exceeded its powers, the defendant, despite acceptance of probation, may attack an improper term of probation by appeal or application for a writ of habeas corpus. *(In re Bushman, supra,* 1 Cal.3d at p. 776 [fn. 1 above]; *People* v. *Osslo, supra,* 50 Cal.2d at p. 104; *People* v. *Dominguez, supra,* 256 Cal.App.2d at p. 629; and *People* v. *Williams, supra,* 247 Cal.App.2d 394, 404.)

■ "Although the discretion of the trial court in granting probation, and imposing the conditions of probation and in revoking or modifying those conditions . . . is wide, its powers are not boundless." (*In re*

---

[3]For example, in *People* v. *Bresin* (1966) 245 Cal.App.2d 232 [53 Cal.Rptr. 687], the opinion recites, "When the terms of the probation were read to defendant, he was personally asked by the court whether he accepted those terms. After conferring with his counsel defendant stated that he accepted the terms. Defendant had the right to refuse probation if he felt the terms were more harsh than the sentence imposed *(People* v. *Osslo,* 50 Cal.2d 75, 103 . . .)" (245 Cal.App.2d at p. 240.) In the instant case, the trial court, in denying petitioner's motion to modify the terms and conditions of his probation, observed, "Clearly, from the above, it is evident that the defendant was fully aware of the conditions prescribed and the nature of such conditions. It is equally clear that petitioner had the right to either accept or reject such conditions. In his petition, Counsel for the petitioner does not allege any reason for modification of the conditions of defendant's probation other than one which existed at the time of its imposition by the Court. The nature of such conditions and the consequence of defendant's acceptance thereof was well known to both petitioner and his Counsel. Certainly, if Counsel and petitioner truly believed· that such conditions violated the defendant's constitutional rights, it then appears that they deliberately chose not to raise the question at that time."

*Peeler, supra,* 266 Cal.App.2d 483, 489. See also *People* v. *Dominguez, supra,* 256 Cal.App.2d 623, 627; and *People* v. *Williams, supra,* 247 Cal.App.2d 394, 407.) "A condition of probation which (1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality does not serve the statutory ends of probation and is invalid." *(People* v. *Dominguez, supra,* 256 Cal.App.2d at p. 627.)[4]

The application of these criteria can be traced through the cases which have been referred to above and through earlier cases, which are reviewed in *People* v. *Dominguez* (256 Cal.App.2d at pp. 627-628), and *People* v. *Williams* (247 Cal.App.2d at pp. 403-404) and need not be reexamined here. The pertinent precedents are noted below.

The first condition, set forth in what has been denominated paragraph "[3]" of the order admitting petitioner to probation, restrains his freedom to associate with others. ■ The right to "become a member, either actively or passively, of any political or other organization, either on or off campus that participates in or advocates any form of protest or change in existing conditions" is a constitutionally protected right. In *Vogel* v. *County of Los Angeles* (1967) 68 Cal.2d 18 [64 Cal.Rptr. 409, 434 P.2d 961], the opinion states, "The United States Supreme Court . . . pointed out that persons who join an organization but do not share in its unlawful activities pose no threat either as citizens or as public employees, that a law which applies to membership without the specific intent to further the illegal aims of the organization infringes unnecessarily on protected freedoms and rests on the doctrine of guilt by association, and that such a law cannot stand. *(Elfbrandt* v. *Russell* [1966] *supra,* 384 U.S. at pp. 17-19 . . .)" (68 Cal.2d at p. 23. See also *Keyishian* v. *Board of Regents* (1967) 385 U.S. 589, 607 [17 L.Ed.2d 629, 643, 87 S.Ct. 675]; *Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 508-509 [55 Cal.Rptr. 401, 421 P.2d 409]; and *Fort* v. *Civil*

---

[4]*In re Bushman, supra,* 1 Cal.3d 767 restates this rule in the disjunctive as follows: "A condition of probation imposed pursuant to Penal Code section 1203.1 is invalid if it (1) has no relationship to the crime of which the defendant is convicted, (2) relates to conduct that is not itself criminal, or (3) requires or forbids conduct that is not reasonably related to future criminality. *(People* v. *Dominguez* (1967) 256 Cal.App.2d 623, 627 . . .)" (1 Cal.3d at pp. 776-777.) It is questionable that the court intended to invalidate any condition of probation which relates to conduct that is not itself criminal, on that ground alone. The discussion that follows indicates that if the condition had a relationship to the crime of which petitioner was convicted, *or* was reasonably related to future criminality it would be proper even though it related to conduct that is not itself criminal, i.e., refusal to secure psychiatric care, provided, as was not the case in *Bushman,* the need for such care had been established by the record.

*Service Commission* (1964) 61 Cal.2d 331, 334-335 [38 Cal.Rptr. 625, 392 P.2d 385].)

From the foregoing it is clear that the prohibited conduct is not in itself criminal. Nevertheless, *People* v. *Osslo, supra,* suggests that when the offense of which the defendant was convicted arose out of his activities with an organization, his activities, within such organization even though otherwise lawful may be curtailed. The court said, ". . . since it could be and presumably was found that these defendants are guilty of crimes growing out of union activities, it appears not improper that restrictions be placed upon such activities as a condition of probation." (50 Cal.2d at p. 103.) The People also rely upon *People* v. *King, supra,* which upheld conditions of probation which the opinion refers to as follows: ". . . the trial judge suspended proceedings and placed defendant on probation for three years on certain conditions, one of which, according to order made in open court, was 'that she not take an active or official part in any other demonstrations of this kind during the period of probation'; according to the judgment she was 'Not to participate actively in demonstrations involving sit-down, road-blocking, et cetera.'" (267 Cal.App.2d at p. 819.) The court affirmed an order revoking the defendant's probation for her active participation—blowing up balloons—in a peaceful anti-war demonstration against a manufacturer of a product used in napalm bombs. (*Id.,* pp. 826-827.) In upholding the conditions of probation, the court observed, "A reading of the record makes the purpose of the disputed condition obvious. Since defendant was guilty of crimes growing out of a demonstration and had suffered a prior conviction arising out of one, it was not improper that restraint was placed on such activity. (*People* v. *Osslo,* 50 Cal.2d 75, 103. . . .) From her conduct in the June 20, 1967, demonstration, which the trial judge assigned to her youth, lack of emotional maturity, exercise of poor or any judgment, and lack of regard for the rights and property of others, he correctly assessed defendant's proclivities when involved with others in a protest or demonstration. The clear purpose of restraining her from active participation in future demonstrations was to protect her from her own irresponsible conduct when involved in emotionally charged situations which she seems to be too immature to handle." (*Id.,* pp. 823-824, fn. omitted.) Her "crimes" were described as follows: "While originally she was charged with two counts of battery upon a peace officer and the trial judge felt that 'this is, in fact, a felony,' defendant was actually convicted of two counts of simple assault in violation of section 240, Penal Code, a misdemeanor." (*Id.,* p. 827.)

In *King,* however, the court distinguished between active participation in demonstrations, and any abridgement of the defendant's First Amendment rights. It stated, "At the outset, it should be noted that the judge did not bar

her from peaceful attendance at gatherings or speeches or the exercise of free speech and association; but he did warn her that the exercise of her own rights does not include a destruction of the rights of others. . . . Surely the condition that she not 'participate actively in demonstrations involving sit-down, road-blocking, et cetera' does not proscribe her freedom of speech and association under the First Amendment. Further, whether, in a protest or dissent, the right of free speech or association is exercised in such a way as to bring the protestor under the shield of the constitutional guarantees must depend upon the circumstances—what is said, the place where it is uttered, the purpose of the utterance, the manner in which it is uttered, the size of the assemblage and its purpose, and whether the utterance is accompanied by activities such as blocking movement of traffic, trespassing on public or private property, interfering with the rights of others, preventing ordinary use of premises by an occupant, physically attacking law enforcement officers, etc. We cannot hold under the circumstances of this case that the condition of probation in any manner abridges defendant's First Amendment freedoms." (Id., pp. 825-826, fn. omitted.)

In this case the court had before it a probation report which revealed the following: The present conviction of assault arose out of an incident which occurred in a "highly charged emotional atmosphere" during an unauthorized demonstration at the College of San Mateo. Petitioner kicked another young man in the face, resulting in a severe dislocation and breaking of the latter's jaw. Petitioner had earlier been suspended from the College of San Mateo and was not authorized to appear on campus.

Petitioner's prior criminal record consists of misdemeanor offenses resulting from his activities in various anti-draft and anti-war movements in Wyoming, Oakland and Berkeley, California. In at least one of those instances petitioner was specifically noted by campus police officers at the University of California as having kicked them with heavy boots. (See also, fn. 8 below.) It also appears from the proceedings at sentencing that the diagnostic report from the Department of Corrections (Pen. Code, § 1203.03) recommended that the petitioner be sent to prison.

The court orally pronounced the terms of probation in substantially the form in which they are found in the order.[5] The judge also advised the

---

[5]The judge stated, ". . . during the time you are enrolled in school or not, . . . you will not become a member of or engage in any activities of any organization protesting any activities on or off a college, high school or junior high school campus. That includes either active or passive involvement. In other words, advising or what have you. I want to make sure that you understand this, that any organization except the student body, the official student body organization of the school that you are attending, and this is any organization that advocates any kind of a protest, regardless of whether it is a protest concerning an on-campus matter or an off-campus matter;

defendant, ". . . you are going to be gagged is what I have got in mind as far as participating in campus activities, not because I am opposed to protest, but of the fact that you were not able to control yourself while you were in fact engaged in a protest movement."

After the judge pronounced the conditions of probation, the following colloquy occurred: "[Petitioner]: That includes no speaking, right, at any functions on the campus, right? No contributing by writing and no participation in any organizations on or off the campus that do what, that are— I mean, off-campus, too, that's got anything to do with the campus or no off-campus thing period? The Court: Involving any on or off-campus activities. In other words, I am putting the gag on you. I want you to understand that. [Petitioner]: In other words, it's no organizations, then. The Court: That's right. As I say, if you stay out of any organizations, except the official student body of the campus, the student body organization for the purpose of getting a student body card to go to various activities, that's it. You can go to school. I want you to go to school. That's one of the conditions of probation, but the gag is on. You go there to study and study alone. [Petitioner]: No speaking? The Court: No speaking; no writing upon any of these matters that are of vital interest to you. I know that these are tough conditions. Do you accept them? [Petitioner]: Yes, Your Honor."

The court's motivation is clearly analogous to that found and approved in *People* v. *King, supra.* ■ Nevertheless, the conclusion that the petitioner was unable to control himself while he was in fact engaged in a protest movement does not rationally require a curb on all thought or expression in order to discourage future criminality. The physical restraint of a prison sentence from which the petitioner was relieved would have curbed his activity, and physical association with companions of his own choosing. It could not, however, imprison his ideas or purge his mind of his beliefs. Should more be required as a condition of probation? It is only action or the threat of immediate action that could result in future criminality. *People* v. *King, supra,* goes no further.

■ It is true that the petitioner's membership in organizations participating in and advocating protests or change of existing conditions may

---

that you will not become a member of or contribute articles to any official or unofficial newspaper or other publication or any kind whatsoever. This includes college, high school or junior high school campuses. . . . Also, that you will not be on any college campus or high school or junior high school campus where you are not enrolled, except in connection with a — for attending a course or program officially sponsored by that campus. In other words, if you are attending Cal, you want to go to a program of — a lecture of some kind at the College of San Mateo, you may do so; but if they are having a demonstration up there, you are not to be there." (Cf. fn. 2 above.)

bear some relationship to the offense of which he was convicted. It was only, however, his active participation in demonstrations sponsored by such organizations which resulted in criminal action. His mere embracing of the causes referred to would not alone have led to his transgressions. Moreover, the order is not limited to organizations which are engaged in demonstrations leading to violence, and breaches of the peace or violations of other laws. From all that appears the defendant could not become a member of a political party advocating a reform of welfare payment procedures, or legislation designed to preserve man's environment.[6]

It is concluded that the first sentence of paragraph "[3]" of the conditions of probation is invalid insofar as it prohibits petitioner's passive membership in any of the organizations included in the court's proscription. On the precedent of *People* v. *Osslo, supra,* he may be prohibited from holding any office or position of responsibility in any organization to which he belonged while he was engaged in unlawful activities. The record (see fn. 8 below) fails to reflect that petitioner's criminal conduct can be attributed to a course of conduct involving a particular organization, as distinguished from an unpremeditated individual act of violence. ■ He also may be prohibited from actively participating in demonstrations staged by any organization included in the court's order. (See *People* v. *King, supra,* 267 Cal.App.2d 814, 825.[7]) The further restrictions fail to come within the criteria pronounced in *People* v. *Dominguez, supra* (256 Cal.App.2d at p. 627) and approved in *In re Bushman, supra* (1 Cal.3d at pp. 776-777).

■ The conditions in the second and third sentence of paragraph "[3]" curb petitioner's freedom of expression, written and oral. It is axiomatic that freedom of speech is a constitutionally protected right, and cannot be criminal per se aside from some vice in its content. (See *Brandenburg* v. *Ohio* (1969) 395 U.S. 444, 448 [23 L.Ed.2d 430, 434, 89 S.Ct. 1827]; and *Carroll* v. *President & Com'rs. of Princess Anne* (1968) 393 U.S. 175, 180-181 [21 L.Ed.2d 325, 330-331, 89 S.Ct. 347].) Petitioner's writing, albeit in protest of or for a change of, existing conditions, does not appear to have any direct relationship to the crime of which he was convicted, nor has it been shown to have any effect on his future criminality.

[6]No opinion is expressed as to whether the defendant has forfeited his right as an elector. (See, Cal. Const., art. II, § 1; Elec. Code, §§ 20, 310, subd. (i), 321, subd. (10), 383, subd. (c), and 14240, subd. (g); Pen. Code, §§ 1203.4 and 2600; and *Stephens* v. *Toomey* (1959) 51 Cal.2d 864, 869 and 875 [338 P.2d 182]. Cf. *Otsuka* v. *Hite* (1966) 64 Cal.2d 596, 605-611 [51 Cal.Rptr. 284, 414 P.2d 412].)

[7]It may be noted that three members of the state Supreme Court voted for a hearing in *King* despite the limited nature of the condition.

His speaking was directly related to the assault.[8] It may rationally be inferred from petitioner's past conduct, that future speeches under similar circumstances would tend to produce confrontations leading to future criminality. The condition, however, covers any speech for any organization regardless of the subject matter or the nature of the organization. It is, therefore, too broad to satisfy the *Dominguez* criteria. Insofar as it embraces a reasonable restraint, it is encompassed in condition "[5]," which is discussed below.

■ In the final sentence petitioner's freedom of movement is curtailed. Here again the exercise of the right restrained is not only lawful in itself, but also constitutionally protected. (See, *Shapiro* v. *Thompson* (1969) 394 U.S. 618, 629-631 [22 L.Ed.2d 600, 612-613, 89 S.Ct. 1322].) Moreover, banishment itself is a prohibited term of probation. (*People* v. *Blakeman* (1959) 170 Cal.App.2d 596, 597-598 [339 P.2d 202].) This is not to say, however, that a state university or college, or a local junior college, or high school, may not reasonably control admission to its premises. (See, Pen. Code, §§ 626-626.8; and Ed. Code, §§ 15801 and 25422.5.) His unauthorized presence at the scene of the crime was related to its commission, and it may be reasonable to assume that his presence on another campus for the purpose of actively participating in a demonstration could lead to future criminal conduct. The restraint imposed, however, is overbroad and prohibits lawful movement which has no relationship with past or future criminality.

It is concluded that the conditions in paragraph "[3]," insofar as they exceed the general prohibition in paragraph "[5]" are invalid because they exceed accepted criteria for what reasonably may be imposed as a condition of prohibition.

■ Condition "[5]" states, "He shall not participate in, actively or passively, nor shall he be an advisor to any on-campus or off-campus

---

[8]The probation report recites: "On December 12, 1968, at approximately 10:30 a.m., the defendant was speaking at an unauthorized rally in front of the Student Union Building at the College of San Mateo. He was using a public address system which had been sent up by several of the activist groups on campus and apparently standing on some type of concrete ash tray delivering his speech. During the course of the speech, which dealt in alleged injustices on campus, a student in the crowd, . . . , challenged the defendant's statements in a manner which apparently offended not only the defendant but several black students who were standing near the victim. One of the black students (not identified) struck the victim in the face several times, knocking him to the ground. Other black students, as well as some white students, continued to push and hit the victim while he was down. The exact circumstances of this particular activity are unknown as it occurred so rapidly in a very emotionally charged atmosphere. The defendant, however, jumped down from where he was speaking and kicked the victim in the face, severely fracturing the victim's jaw. At the time the defendant was wearing heavy boots."

demonstration for any purpose whatsoever." It may be, and is, interpreted as curbing the petitioner's freedom of assembly, speech (including writing), and movement insofar as the exercise of any of those freedoms are directed to a demonstration, whether the demonstration be advocating a form of protest, a change in existing conditions or maintenance of the status quo. Insofar as this condition prohibits active participation in a demonstration involving "sit-down, road-blocking, et cetera" it is countenanced by *People* v. *King, supra,* and warranted by the court's finding, on an adequate record, that the petitioner has not been able to control himself when he was in fact engaged in a protest movement. It does not follow, however, that being an advisor to a demonstration bears any relationship to his past or future criminality. He was not charged or found guilty of inciting others to riot or to commit any other breach of law. From all that appears he may advise peaceful rather than unlawful demonstrations. If he engages in any criminal practices[9] or becomes abandoned to improper associates or a vicious life his probation may be revoked in any event. (Pen. Code, § 1203.2.)

Insofar as passive participation connotes participation which is not active or open it may not only be undetected, but also may have no relationship to his past or possible future criminality. The phrase may also convey the meaning attributed to it in "passive resistance" which connotes techniques and acts of noncooperation in place of violence or active measure of opposition. Paragraph "[5]" may, therefore, be clarified to read, "He shall not actively participate or engage in any on-campus or off-campus demonstration, or protest, or passive resistance for any purpose whatsoever."

It is true that petitioner's conviction subjected him to imprisonment which would restrain his freedom of association, speech, and movement, but it is an over-simplification to conclude that the greater restraint should include the lesser. History is replete with examples that demonstrate that imprisonment does not curb thought or the dissemination of ideas. "Putting the gag" on the convicted probationer, insofar as it is not directly related to a past criminal abuse of the privilege of freedom of speech itself, or to the prospect of future criminality, does not serve to further

---

[9]Society has adequately protected itself against abuse of the exercise of freedom of speech, assembly and movement. (See, e.g., Pen. Code, § 379 [obstructing any public park, street, or highway]; §§ 404, 404.6 and 405 [riot and incitement to riot]; §§ 406-410 [rout and unlawful assembly]; § 415 [disturbing the peace]; § 415.5 [disturbing the peace of any junior college, state college, or state university]; § 416 [unlawful assembly]; §§ 418-420 [unlawful entry, etc.]; § 602 [criminal trespasses]; § 602.5 [unauthorized entry]; § 602.10 [obstruction of teachers or students]; §§ 626-626.8 [violation of regulations governing entry and access to a university, etc. campus]; and Ed. Code, § 16701 [disturbance of public school].)

"the end that justice may be done, that amends may be made to society for the breach of the law," nor does it provide "generally and specifically for the reformation and rehabilitation of the probationer." (See Pen. Code, § 1203.1.) It has been recognized that the public interest in the free flow of information, and the right of freedom of speech which protects it, preclude precensorship of speeches made by a parolee or the subject of prison conditions. (See *Hyland* v. *Procunier* (N.D. Cal.) 311 F.Supp. 749. Note also, *Jackson* v. *Godwin* (5th Cir. 1968) 400 F.2d 529, 535, and 541-542; and *Palmigiano* v. *Travisono* (D.R.I. 1970) 317 F.Supp. 776 [7 Crim.L. 2481].)

## II

The restraint attendant to the prohibition or active participation in demonstrations which has been countenanced above does interfere with the constitutional rights which petitioner was entitled to enjoy before his conviction.

"It is now well settled that, although an individual can claim no constitutional right to obtain public employment or receive any other publicly conferred benefit, the government may not condition public employment or receipt of such benefit upon any terms that it may choose to impose, and that the power of government to withhold benefits from its citizens does not encompass a 'lesser' power to grant such benefits upon an arbitrary deprivation of constitutional rights. [Citations.]" (*Vogel* v. *County of Los Angeles, supra,* 68 Cal.2d 18, 21. See also, *Parrish* v. *Civil Service Commission* (1967) 66 Cal.2d 260, 271 [57 Cal.Rptr. 623, 425 P.2d 223]; *Bagley* v. *Washington Township Hospital Dist., supra,* 65 Cal.2d 499, 503-505; and *Danskin* v *San Diego Unified Sch. Dist.* (1946) 28 Cal.2d 536, 545-547 [171 P.2d 885].[10])

*In re Allen* (1969) 71 Cal.2d 388 [78 Cal.Rptr. 207, 455 P.2d 143], suggests that the principle is applicable to conditions of probation. The court stated, "The government is without constitutional authority to impose a predetermined condition on the exercise of a constitutional right or penalize in some manner its use." (71 Cal.2d at p. 391.) In striking down a condition of probation that the defendant, who was presumably indigent at the time of her trial, reimburse the county for funds expended in supply-

[10]It is unnecessary to herein review the decision of the United States Supreme Court, and other precedents and commentaries which are collected in the cases cited above, and many of which are relied upon by petitioner. Those which are deemed compelling are referred to below. Reference may also be made to Van Alstyne, *The Demise of the Right-Privilege Distinction in Constitutional Law* (1968) 81 Harv. L.Rev. 1439; and Comment, *Unconstitutional Conditions* (1968) 117 U.Pa.L.Rev. 144.

ing her court-appointed counsel, the court concluded "that the imposition of the condition under attack constitutes an impediment to the free exercise of a right guaranteed by the Sixth Amendment to the Constitution and as with respect to other impediments or forms of compulsion against the exercise of such rights may not be permitted by the courts." (*Id.*, pp. 391-392. Cf., however, *People* v. *Kern, supra,* 246 Cal.App.2d 962, 965.)

Nevertheless, in *Bagley* v. *Washington Township Hospital Dist., supra,* the court observed, "On the other hand, we cannot accept the apparent suggestion of some few cases that government may *never* condition the receipt of benefits or privileges upon the non-assertion of constitutional rights. [Citations.] . . . Just as we have rejected the fallacious argument that the power of government to impose such conditions knows no limits, so must we acknowledge that government may, when circumstances inexorably so require, impose conditions upon the enjoyment of publicly conferred benefits despite a resulting qualification of constitutional rights." (65 Cal.2d at p. 505, fn. omitted.)

▇▇▇ The criteria for determining whether the qualification of a constitutional right may properly be imposed are set forth in *Parrish* v. *Civil Service Commission, supra,* as follows: "When . . . the conditions annexed to the enjoyment of a publicly conferred benefit require a waiver of rights secured by the Constitution, however well-informed and voluntary that waiver, the governmental entity seeking to impose those conditions must establish: (1) that the conditions reasonably relate to the purposes sought by the legislation which confers the benefit; (2) that the value accruing to the public from imposition of those conditions manifestly outweighs any resulting impairment of constitutional rights; and (3) that there are available no alternative means less subversive of constitutional right, narrowly drawn so as to correlate more closely with the purposes contemplated by conferring the benefit. [Citations.]" (66 Cal.2d at p. 271.)

▇▇▇ These criteria in part embrace those which have been reviewed in connection with the determination of the validity of the terms and conditions of probation. It is unnecessary to determine whether the two tests are coterminous. It suffices to state that the restraint on petitioner's freedom from prohibiting his active participation in demonstrations reasonably relates to his reformation and rehabilitation; that the value accruing to the public from the imposition of such conditions outweighs the resulting impairment of constitutional rights; and that the narrow restriction, to circumstances which are apt to become emotionally charged, is an alternative which correlates closely with the purposes to be served by probation.

In view of the invalidation of the overbroad conditions of probation it is unnecessary to discuss the alleged effect of the conditions as a prior

restraint on free speech insofar as the content of petitioner's writing or of nondemonstration related speech is concerned. (See *Carroll* v. *President & Com'rs. of Princess Anne, supra,* 393 U.S. 175, 180-181.) The restriction countenanced goes to the time, place and manner of his speaking or other participation, so as to prevent him from subjecting himself to an emotionally charged atmosphere. Nor is it necessary to determine whether the rights of potential auditors may enlarge the rights of the speaker, or, more accurately, preclude the imposition of otherwise valid restraints on the speaker. (See, *Griswold* v. *Connecticut* (1965) 381 U.S. 479, 482-483 [14 L.Ed.2d 510, 513-514, 85 S.Ct. 1678].) It is obvious that the right to hear, cannot, as did the trumpets at Jericho, blow down the prison walls. Under this decision the potential auditor may under appropriate conditions read all that the probationer may have to say.

The writ is granted and the Superior Court of San Mateo County is directed to modify its order granting probation in accordance with the views set forth above. In all other respects the order to show cause is discharged and the petition is denied.

Molinari, P. J., concurred.

**ELKINGTON, J.**—I respectfully dissent from the views expressed by my colleagues on this court.

Their opinion, as I view it, extends the reach of the First Amendment even beyond its present scope. And it disregards well-established law vesting in the trial court broad discretion in imposing terms and conditions of probation. (See *People* v. *King,* 267 Cal.App.2d 814, 822 [73 Cal.Rptr. 440].)

It seems well at this point to consider the information before the trial court concerning Mannino, his demonstrated propensity for campus violence, and the crime of which he stands convicted.

In Oakland during October 1967 Mannino was arrested for disturbing the peace (Pen. Code, § 415), and refusing to disperse from the scene of a riot. Convicted of disturbing the peace, he was sentenced to 10 days in the county jail.

A month later at a University of California campus during the course of a demonstration by several hundred persons, an attempt was made to tear down several university flags and to replace them with others marked with a skull and crossbones. Several uniformed officers were assigned to prevent such malicious mischief. They were set upon by more than 100 persons who began striking, kicking and choking, and spitting and directing

profanity at, the officers. Among the assaulters was Mannino who "had high heavy top shoes on and was using them to kick the officers." One officer was badly injured on the right knee cap. Mannino, a nonstudent, was charged with and convicted of battery (Pen. Code, § 242) and resisting arrest (Pen. Code, § 148).

In February 1968 Mannino was arrested for some offense while participating in a demonstration at Cheyenne, Wyoming. He was traveling about the county engaged in anti-draft activity.

Thereafter Mannino became a student at the College of San Mateo. For some form of misconduct he was suspended and ordered from the campus. On December 11, 1968, he reappeared on the campus with one Ruiz against whom a warrant was outstanding for interfering "with the peaceful conduct of the activities of [a] school." (Pen. Code, § 602.9, since repealed.) Campus officers, attempting to arrest Ruiz, were prevented from doing so by Mannino who blocked their car. A nearby college instructor intervening in some way was struck several times on the head by Mannino and knocked to the ground. Mannino was arrested for this offense and released on bail.

The subject matter of Mannino's felony assault conviction (Pen. Code, § 245) occurred the following day. The record before us shows the following:

"On December 12, 1968, at approximately 10:30 a.m., the defendant was speaking at an unauthorized rally in front of the Student Union Building at the College of San Mateo. He was using a public address system which had been set up by several of the activist groups on campus and apparently standing on some type of concrete ash tray delivering his speech. During the course of the speech, which dealt in alleged injustices on campus, a student in the crowd, Kenneth H. Cheeseman (date of birth June 4, 1948), challenged the defendant's statements in a manner which apparently offended not only the defendant but several black students who were standing near the victim. One of the black students (not identified) struck the victim in the face several times, knocking him to the ground. Other black students, as well as some white students, continued to push and hit the victim while he was down. The exact circumstances of this particular activity are unknown as it occurred so rapidly in a very emotionally charged atmosphere. The defendant, however, jumped down from where he was speaking and kicked the victim in the face, severely fracturing the victim's jaw. At the time the defendant was wearing heavy boots.

"The victim . . . was taken from the area by several of the college's instructors and transported to the hospital. Extensive medical treatment has been required by the victim due to the severity of the injury to his jaw."

Following his conviction some months later, Mannino's reflective attitude toward his crime and plight was indicated by his statement: "As to the present offense, I stand on my testimony in Court. I was acting in self-defense in a highly tense situation. I am innocent of the charges and acted in what I thought was a correct manner."

Despite the recommendation of a diagnostic facility of the Department of Corrections (pursuant to Pen. Code, § 1203.03) that Mannino be committed to state prison, the trial judge placed him on probation. But in doing so the court, among other things, ordered: "[1] He shall not, during the period of probation, speak for any organization on any college, high school, or junior high school campus or at any public function. [2] He shall not, during the period of probation, be present on any college, high school, or junior high school campus where he is not currently enrolled except for official courses, or other purpose specifically authorized by the school that he is attending. [3] He shall not participate in, actively or passively, nor shall he be an advisor to any on-campus or off-campus demonstration for any purpose whatsoever."

The majority find the trial court's order that Mannino, during the period of probation, not speak "for any organization on any college, high school, or junior high school campus or at any public function" would *"curb [his] freedom of expression" under the First Amendment,* since it "covers any speech for any organization regardless of the subject matter or the nature of the organization." They also find the proscription against his being present, except on legitimate business, on the campus of any educational institution where he is not enrolled, would curtail *"his freedom of movement."* Such a restraint, they say, "is overbroad and prohibits lawful movement which has no relationship with past or future criminality."[1] Constitutional fault is also found in the trial court's requirement that Mannino "shall not participate in, actively or passively, nor shall he be an advisor to any on-campus or off-campus demonstration for any purpose whatsoever." It is said that this "may be, and is, interpreted as *curbing the petitioner's freedom of assembly, speech (including writing), and movement . . ."* and that "From all that appears he may advise peaceful rather than unlawful demonstrations." (Italics added.) Such restraint, it is concluded "is overbroad and prohibits lawful movement which has no relationship with past

---

[1]The majority do not consider the common practice of "modifying" probation conditions when good cause therefor appears. It seems obvious, from the thoughtful consideration already given Mannino by the trial judge, that if the probation conditions appeared unreasonably restrictive of any *legitimate purpose* of Mannino such a modification would be forthcoming. If not, perhaps then First Amendment and other constitutional rights would reasonably be at issue.

or future criminality," and, too, his "passive participation" in such a demonstration "may have no relationship to his past or possible future criminality."

*People* v. *King, supra,* 267 Cal.App.2d 814, 822 [73 Cal.Rptr. 440], restates the settled rule that: "Probation is not a matter of right but an act of clemency, the granting and revocation of which are entirely within the sound discretion of the court . . .; and in granting probation the trial court has broad discretion in imposing terms and conditions thereof."

The majority hold that the probation conditions imposed by the trial judge constitute an abuse of this broad discretion. They necessarily say that no *reasonable* man, or judge, would have imposed similar conditions under the facts of this case, for " 'discretion is abused whenever, in its exercise, a court exceeds the bounds of reason, —all the circumstances before it being considered.' " (*Crummer* v. *Beeler,* 185 Cal.App.2d 851, 858 [8 Cal.Rptr. 698].)

With profound respect for my distinguished colleagues, I find myself obliged to conclude that the error of this case lies, not with the trial judge below, but instead with the rationale and conclusions of the majority of this court.

In my view, under the facts of this case, nothing could be more *reasonable* than the expectation that Mannino, again on a campus without scholastic or other school authorization, demonstrating and speaking for organizations thereon, would revert to the behavior which led to his conviction. For more than two years prior to arrest Mannino's sole purpose in life seems to have been the violent expression of his particular beliefs. Even today, speaking of the heavy-booted fracturing of his victim's facial bones he says, "I . . . acted in what I thought was a correct manner."

A highly revered American once wisely expressed himself in this manner: "I have but one lamp by which my feet are guided, and that is the lamp of experience. I know no way of judging of the future but by the past."[2] But the majority say from "all that appears [Mannino] may advise peaceful rather than unlawful demonstrations," and that his future participation in demonstrations "may have no relationship to his past or possible future criminality." And they conclude that the trial judge, thinking otherwise, exceeded "the bounds of reason."

According to the standards of the majority, the lower court could legally and properly and *reasonably* have committed Mannino to state prison for his offense. There he would surely have been frustrated in his campus visitation and demonstration desires and any attendant First Amendment

---

[2]Patrick Henry—speech in the Virginia Convention, March 1775.

rights. But the trial court, with obvious concern both for Mannino *and* for his probable future victims, weighing the respective interests thought otherwise and imposed the probation conditions which are the basis of this appeal. But in this, it is said the trial court acted *unreasonably*.

The holding of the majority undoubtedly has its genesis in the development of the concept of the "Supremacy of the First Amendment." The doctrine is otherwise expressed as the "preferred freedom" and "preferred position" and "preferred place" of the First Amendment. It has been said to imply a sort of presumption in favor of those who claim denial of their First Amendment rights. The doctrine is of recent origin. In a primitive form it seems to have been first expressed in *Herndon* v. *Lowry,* 301 U.S. 242 [81 L.Ed. 1066, 57 S.Ct. 732] (see discussion, *Kovacs* v. *Cooper,* 336 U.S. 77, 90 [93 L.Ed. 513, 524, 69 S.Ct. 448, 10 A.L.R.2d 608]). Before long it became the "preferred freedom." It seemed analogous to the special place a mother might find in her heart for her first born, while yet equally lavishing her love upon all. It was a catchy phrase—and as any good slogan will—it soon became widely known and used, with successive users expanding (as I believe this court does today) upon its meaning and coverage. Today it seems considered by many, judiciary, bar and laity alike, as sort of an article of faith to be accepted without inquiry or analysis by all true believers.

Nevertheless, "preferred freedom" is a mischievous phrase, for while seeming to express the idea of "first among equals" as originally intended, in our law today it connotes the idea of *preference over other rights and other freedoms.* I dispute the soundness of this common current concept. The First Amendment is not *reasonably* to be preferred over the Fourth, which guarantees "The right of the people to be secure" in their homes "against unreasonable" governmental intrusion. Nor does it seem that the First Amendment *reasonably* displaces in importance the right to a fair trial or the right not to "be deprived of life, liberty, or property, without due process of law, . . ." (Fifth and Fourteenth Amendments), or other of our rights.

The case before us is a good illustration of the present day abuse of the concept under discussion.

The transcendental right in any enlightened state, certainly the United States, is the right of its people to protection from violence. This right is inherent in all constitutions. It is expressed by the centuries old maxim, *"the safety of the people is the supreme law."* (Italics added.) (*Ex parte Drexel,* 147 Cal. 763, 766 [82 P. 429].) Under our system this unquestionably "supreme" right, and its cor-

relative duty, are reserved by the several states. It is so declared by the Ninth and Tenth Amendments.[3]

Any reasonable mind must conclude that Mannino, *demonstrating in any fashion* on a campus, is a menace to the safety of others, particularly those who may choose to exercise *their* First Amendment rights by differing with him. So a conflict arises—a conflict between the basic right of a citizen to protection from violence and the First Amendment's "preferred freedom." Under this day's decision of our court the "preferred freedom" is again allowed to prevail over other established rights. Mannino's "right of expression" on campuses where he does not belong will continue, defeating the time-honored right, and duty, of the trial court to protect others from a vicious felony probationer's near certain assaults. Scant respect is paid to the supreme concern for the "safety of the people" and little consideration is given the next victim of Mannino's face-bashing propensities.

Another unique development under the spell of the "preferred freedom" is appropriately pointed out here.

It is now the law that appellate courts *"in free speech cases must make an independent examination of the whole record,"* and thereupon make their own factual determination. (Italics added.) (*L.A. Teachers Union v. L.A. City Bd. of Ed.,* 71 Cal.2d 551, 557 [78 Cal.Rptr. 723, 455 P.2d 827]; *Zeitlin v. Arnebergh,* 59 Cal.2d 901, 909 [31 Cal.Rptr. 800, 383 P.2d 15, 10 A.L.R.3d 707].)

Our courts long ago concluded that factual disputes are best resolved by judges or juries who hear and observe witnesses in the live atmosphere of the trial court room—rather than by an appellate court which must rely upon a written and sometimes misleading record. As a result the "substantial evidence" rule has developed. This principle holds that when a fact-finding determination is attacked on the ground that it is not sustained by evidence, the power of an appellate court begins and ends with the determination whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached below; when two or more inferences can reasonably be drawn from the facts the reviewing court may not substitute its deductions for those of the trier of fact, nor itself pass upon the credibility of witnesses. (*Green Trees Enterprises,*

---

[3]"AMENDMENT IX

"The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

"AMENDMENT X

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

*Inc.* v. *Palm Springs Alpine Estates, Inc.,* 66 Cal.2d 782, 784-785 [59 Cal. Rptr. 141, 427 P.2d 805].)

Any rule which *compels* appellate courts to substitute their factual findings for those of a trial court or jury must necessarily result in less credible factual resolutions—otherwise there can be no reason for the "substantial evidence" rule, and there is slight purpose in our jury system. Such a practice would tend to deny—rather than assure—constitutionally guaranteed First Amendment rights. And any requirement—that factual determinations in the important area of constitutional rights *must* be made by the tribunal least fitted to do so—must inevitably lead to the degradation of those rights. It is hard to reconcile such a requirement with the rule that in all other areas factual findings on substantial evidence by a court or jury must stand, beyond the reach of appellate courts even though one's freedom, or even life, may be in the balance.

I have said that the expression "preferred freedom" is a "mischievous phrase." This was not the presumptuousness of a minor appellate judge; its authorship is not mine. It was the considered judgment of a giant of our judicial history, Justice Felix Frankfurter. In 1948 in a concurring opinion in *Kovacs* v. *Cooper, supra,* 336 U.S. 77, 89-97 [93 L.Ed. 513, 523-528], the justice described as a *formula,* the phrase "preferred position of freedom of speech." (Judicial phrasemaking later polished the expression into "preferred freedom" and "First Amendment supremacy.") He said (p. 90 [93 L.Ed. p. 524]): "This is a phrase that has uncritically crept into some recent opinions of this Court. I deem it a mischievous phrase, if it carries the thought, which it may subtly imply, that any law touching communication is infected with presumptive invalidity. It is not the first time in the history of constitutional adjudication that such a doctrinaire attitude has disregarded the admonition most to be observed in exercising the Court's reviewing power over legislation, 'that it is *a constitution* we are expounding.' *M'Culloch* v. *Maryland,* 4 Wheat. (U.S.) 316, 407, 42 L.Ed. 579, 602. I say the phrase is mischievous because it radiates a constitutional doctrine without avowing it. Clarity and candor in these matters, so as to avoid gliding unwittingly into error, make it appropriate to trace the history of the phrase 'preferred position.' . . ."

Justice Frankfurter then pointed out that the expression had its origin in a dissenting opinion in *Jones* v. *Opelika,* 316 U.S. 584, 600, 608 [86 L.Ed. 1691, 1703, 1707, 62 S.Ct. 1231], and proceeded to discuss its development through the years. He opined that there had developed an unspoken and unreasonable presumption of invalidity of official conduct or law touching upon communication (contrary to the otherwise universal rule that "all presumptions favor the [constitutional] validity of statutes"; see

*In re Cregler,* 56 Cal.2d 308, 311 [14 Cal.Rptr. 289, 363 P.2d 305]). Recognizing that the First Amendment must often collide with other constitutionally guaranteed rights he indicated that such opposing public interests must be adjusted and reconciled reasonably, not with the supremacy of one over the other. He stated (336 U.S. at p. 95 [93 L.Ed. at p. 526-527]): "Behind the notion sought to be expressed by the formula as to 'the preferred position of freedom of speech' lies a relevant consideration in determining whether an enactment relating to the liberties protected by the Due Process Clause of the Fourteenth Amendment is violative of it"; and (at p. 96 [93 L.Ed. at p. 527]): "The objection to summarizing this line of thought by the phrase 'the preferred position of freedom of speech' is that it expresses a complicated process of constitutional adjudication by a deceptive formula. And it was Mr. Justice Holmes who admonished us that 'To rest upon a formula is a slumber that, prolonged, means death.' Collected Legal Papers, 306. Such a formula makes for mechanical jurisprudence."

And the justice warned that *"Complicated problems [are] hardly to be solved by an easy formula about the preferred position of free speech."* (Italics added.)

Many areas of present day disruption of our national life point to the wisdom and prescience of Justice Frankfurter.

Following the "preferred freedom" formula it is now the law that the First Amendment protection of freedom of expression "stops with the perpetration of violence [since] free discussion must die upon the battlefields of force." (*In re Cox,* 3 Cal.3d 205, 223 [90 Cal.Rptr. 24, 474 P.2d 992].) This must mean, and certainly it is generally believed to mean, that any words, or conduct, short of violence, regardless of how ominous, threatening, *or certain to result in violence,* are constitutionally protected forms of expression. Some illustrations of the inevitable result follow.

We advert again to the case at bench for an example. Regardless of Mannino's demonstrated propensity for violence and the near certainty that such will attend his permitted "passive" campus demonstrations, the trial court is rendered impotent by the "preferred freedom" until another victim's jaw is broken or some similar violence recurs.

Because of similar reasoning, today armed and threatening mobs may demonstrate by marching upon college administrative buildings, banks, and other premises constitutionally undeterred, until their openly declared objective, destruction of property, or arson, or whatever it may be, is accomplished—at which point their mobilization of force is generally beyond governmental control.

College professors may without restraint openly teach and advocate the overthrow of the United States by force; emphasizing the obvious, this means by killing and maiming people.

Another pertinent area in which presumptively lesser rights must yield to First Amendment supremacy is pointed up by *In re Kay,* 1 Cal.3d 930 [83 Cal.Rptr. 686, 469 P.2d 142]. Kay and others were convicted by a jury of violating Penal Code section 403, which states: "Every person who, without authority of law, wilfully disturbs or breaks up any assembly or meeting, not unlawful in its character, . . . is guilty of a misdemeanor." While a political candidate was addressing a group of about 6,000 persons, the defendants joined "between 25 and 250" other persons for less than 10 minutes in rhythmically handclapping and shouting. Substituting its own findings for those of the jury, as demanded by *L.A. Teachers Union* v. *L.A. City Bd. of Ed., supra,* 71 Cal.2d 551, and *Zeitlin* v. *Arnebergh, supra,* 59 Cal.2d 901, the court found no substantial disruption, and Kay's conduct to be constitutionally permitted despite California law. Ironically, this rejects the First Amendment rights of the candidate to speak and of his audience to hear. A result: It is common knowledge that high public officials and candidates for public offices, under the coercion of such permitted activity, tend to avoid exposing themselves in public appearances.[4]

Another illustration is disclosed by *Mandel* v. *Municipal Court,* 276 Cal. App.2d 649 [81 Cal.Rptr. 173]. Mandel, 23 years old, attempting to organize a high school student strike, passed out handbills on several school campuses, which stated (p. 675): " '. . . *groups are organizing a student strike* and other activities against the war, the draft and racism *for April 26.'*

---

[4]The *post In re Kay* posture of the applicable law seems to be well illustrated by the following current news items of the San Francisco Chronicle:

### "HECKLERS ROUT LODGE AT STANFORD

"Ambassador Henry Cabot Lodge, the statesman-diplomat who is this country's representative to the Vatican, was hooted and heckled off the stage at Stanford yesterday as he sought to open a three-day conference on the United Nations.

"The usually imperturbable Boston Brahmin, face flushed with distress, faced an overflow audience of more than 800 in Dinklespiel auditorium for about ten minutes, as upwards of 150 young people shouted unprintable epithets at him and chanted antiwar slogans. . . .

"Lodge and his entourage were hustled out the back entrance of the auditorium and were rushed to the Faculty Club. There, hurriedly and almost in secret, the ambassador's speech was rescheduled." (January 12, 1971.)

"Calling Ambassador Henry Cabot Lodge a 'war criminal,' Professor H. Bruce Franklin yesterday defended demonstrators—himself included—who shouted down Lodge during a speech at Stanford on Monday.

"Franklin, a self-proclaimed Maoist and a leader of many demonstrations at Stanford in recent years, questioned whether 'a murderer like that' still deserved freedom of speech—or even the right to live." (January 13, 1971.)

For obvious reasons no arrests were made or other police action taken.

It continued, *'If you want to help,* if you need help with the draft, or if you just have questions about the war, *there'll be a meeting.'* (Italics added.) . . . ." Refusing to leave the premises of one of the schools he was arrested for a misdemeanor violation of Penal Code section 602.9 (since repealed) which stated: "Any person who comes . . . upon any school ground . . . without lawful business thereon, and whose presence or acts interfere with the peaceful conduct of the activities of such school or disrupt the school or its pupils or school activities, and who remains there, after being asked to leave . . . is guilty of a misdemeanor." It was held (p. 674) that the provisions of this section "cannot be constitutionally construed to block the channels of peaceful communication or stifle peaceful activity." The municipal court was prohibited from trying Mandel. It would seem that the right of parents and of the state to educate their children (see Ninth and Tenth Amendments, quoted *ante,* fn. 3) were given scant consideration when overshadowed by the First Amendment's "preferred freedom."

The runaway nature of this present day interpretation of the First Amendment is perhaps best exemplified by recent California decisions relating to obscenity.

In 1961 the Supreme Court in *In re Harris,* 56 Cal.2d 879, 880 [16 Cal. Rptr. 889, 366 P.2d 305], reaffirmed established law that "The standard for judging obscenity adequate to withstand the charge of constitutional infirmity is whether to the average person, applying contemporary community standards, the dominant theme of the material, taken as a whole, appeals to prurient interest." The concept of "community" was at that time defined as "the people who reside in a given locality in more or less proximity." (*Keech* v. *Joplin,* 157 Cal. 1, 11 [106 P. 222].) The determination whether "the dominant theme of the material, taken as a whole, appeals to prurient interest" was left to juries and trial courts of the community involved.

Then in 1968 the court in *In re Giannini,* 69 Cal.2d 563, 575-580 [72 Cal.Rptr. 655, 446 P.2d 535], uninfluenced by higher authority, announced a new rule. For the purpose of establishing the pertinent "contemporary community standards" the entire state became the community; it was no longer "the people who reside in a given locality in more or less proximity." And also, in *Giannini* the court declared (p. 576) that "the constitutional test for obscenity does not in any way indicate that a jury inevitably can accurately apply this standard without guidance." The jury's guidance was placed in the hands of "expert witnesses." The court gave no suggestion as to the recruitment source of such witnesses, but pointed out that "commentators and courts have concluded that this problem does not raise an insurmountable barrier."

But even as the "statewide community standard—expert witness" rule was being promulgated, it was also being eroded. For in *People* v. *Noroff* (1967) 67 Cal.2d 791 [63 Cal.Rptr. 575, 433 P.2d 479], the court had declared, *as a matter of law,* absent a sexual activity, that the presentation or representation of the human body or any of its parts, no matter how ingenious or suggestive or repulsive the display, is not obscene. By judicial fiat, consideration of community standards in a large field touching on obscenity was thereby removed from juries, trial courts and even expert witnesses.

*People* v. *Noroff, supra,* concerned a $4 per copy magazine entitled "Collectors Issue" which carried the warning "For Adults Only." Inside were 78 pictures, in 74 of which "the genitalia are emphasized." Concluding that the United States Supreme Court had given such material First Amendment protection the court said (p. 796), "We cannot withhold such protection here." The court added (p. 797): "That court has told us that no matter how ugly or repulsive the presentation, we are not to hold nudity, absent a sexual activity, to be obscene. . . ."

*Noroff* is now commonly offered in legal justification for the flood of books and magazines now adorning the shelves of California's periodical shops and other places, containing a wide variety of inventive and suggestive poses by nudes of one, or of the other, or of both sexes, but "absent a sexual activity." A short walk from the chambers of this court will bring one to several such shops prominently displaying this material including life size color reproductions of human genitalia on magazine cover pages. Indeed, in San Francisco one can even purchase at some street corners tabloids actually displaying "sexual activity" on their front pages in defiance of *Noroff's* limits. Why this is permitted I do not know; it probably results from the discouragement of police and prosecutors from attempts to enforce the obviously unenforceable obscenity laws of this state.

The erosion of the *Giannini* "statewide community standard—expert witness" rule continued apace with *Barrows* v. *Municipal Court,* 1 Cal.3d 821 [83 Cal.Rptr. 819, 464 P.2d 483]. There an actor and actress on stage in a play called "The Beard" "simulated" acts of *cunnilingus.* (See *Dixon* v. *Municipal Court,* 267 Cal.App.2d 789 [73 Cal.Rptr. 587].) They were charged with a misdemeanor violation of Penal Code section 647, subdivision (a) which, as pertinent, states: "Every person who commits any of the following acts is guilty of disorderly conduct, a misdemeanor: (a) Who solicits anyone to engage in or who engages in lewd or dissolute conduct in any public place or in any place open to the public or exposed to public view."

The court found no obscenity. Reaffirming an earlier holding, it said

(p. 830): *"Giannini* makes it clear that 'acts which are unlawful in a different context, circumstance, or place, may be depicted or incorporated in a stage or screen presentation and come within the protection of the First Amendment, losing that protection only if found to be obscene.' (69 Cal.2d at p. 572.) We particularly reaffirm this portion of the decision in *Giannini,* for any more restrictive rule could annihilate in a stroke much of the modern theater and cinema. The loss to culture and to First Amendment rights would be equally tragic."

Many are willing to argue that the absence of simulated acts of cunnilingus from our public stages would *not* be an appreciable "loss to our culture," certainly not a "tragic loss."[5]

*Barrows,* as a matter of constitutional law, dictates that public stage portrayals of copulation of one's mouth with the sexual organ of another is not obscene. Such conduct also is thereby placed beyond any control by California's Legislature, or its trial courts, juries, and local legislative bodies. The area in which such bodies may act in the field of obscenity has now approached the point of *de minimis.* Our obscenity laws, in their near entirety, are now imposed upon the people by divided appellate courts (in *Barrows,* 4 to 3) the majorities of which, in my respectful opinion, are pronouncing false gospel.

Today, San Francisco's newspapers,[6] quoting high city officials, declare the city to be the *"Smut Capital of the United States."* It is said that 30 to 40 of its theaters specialize "in pornographic films and live on stage sex acts . . . the grossest, crudest kind of stuff." The spokesman was not talking about such films as "I am Curious (Yellow)," but instead "about the very hard core, denigrating material which is being shown both on the screen and live stage. . . . It is something very sick and very sad." Particularly sad was the appearance of a participant "who appeared to us to be under

---

[5]The exemption of such matter from any state control "when depicted or incorporated in a stage or screen presentation" seems to be well illustrated by another current newspaper story (San Francisco Chronicle, January 12, 1971):

"San Francisco's official smut-smiters suffered at least one and possibly two more serious setbacks yesterday.

"In a decision that could have far-ranging consequences in prosecutions of pornographic movies, Municipal Court Judge Harry W. Low ruled that the hard-core film 'Mona' is not obscene. . . .

"Judge Low in effect threw out the case against Les Natali, 29, manager of several 'adult' theaters, by granting a motion to suppress the evidence (the film 'Mona') against him. . . .

"Judge Low said he found the film 'offensive personally' and a 'waste of money.' But he ruled that despite various explicit acts of intercourse, oral copulation, etc., 'it is not obscene within the requirements of the law.' "

[6]San Francisco Examiner, November 11, 1970; San Francisco Chronicle, November 23, December 29, 1970.

16 years of age and appeared to be pregnant." Shown were films "of bestiality, masochism, sadism, and episodes of gang rape in graphic, life-style form." One theater "which had been showing pornographic movies" to young and old alike was finally "closed because it had become a narcotic drop for students from a nearby school."[7]

I think there should be a general judicial retreat from the excesses to which a blind respect for a deceptive formula has led us. At least in our position as an intermediate court of appeal, bound by the rulings handed down to us by our superiors, we need not today *broaden* the false concept of a "preferred freedom."

I would deny in its entirety Mannino's application for a writ of habeas corpus.

A petition for a rehearing was denied March 1, 1971. Elkington, J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied March 31, 1971. Wright, C. J., McComb, J., and Burke, J., were of the opinion that the petition should be granted.

---

[7]This touches upon the some time argument that willing adults, but of course not children, should be permitted freely to indulge their obscenity fancies. It is difficult to see how matter, which by force of constitutional law *is not obscene,* can legally be kept from juveniles. And recent events have disclosed that each First Amendment extension is quickly and thoroughly exploited among both the young and the old.