[Crim. No. 18816. Second Dist., Div. Five. June 1, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
LINDA LUCILLE ARVANITES et al., Defendants and Appellants.

1054

**COUNSEL**

Farrow & Segura and Ralph M. Segura for Defendants and Appellants.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Howard J. Schwab, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**KAUS, P. J.**—After a jury found defendants guilty of conspiracy to falsely imprison one Adolph T. Brugger (count I) and of the substantive charge of false imprisonment by violence and menace (count II—Pen. Code, §§ 236, 237). Defendants were placed on probation, subject to certain conditions hereafter discussed. They appeal.

FACTS

The facts are these: The People presented their case through two witnesses, one a police officer who, on November 19, 1969, was working for the University of California at Los Angeles. The other was the victim, Adolph Brugger, the executive director of the Associated Students at that university. The entire incident out of which these charges arose stemmed from the fact that a cafeteria worker, Charles Bargaineer, had been discharged and that defendants, together with other students, wanted Brugger to rehire him.

The account given by Jeffrey, the officer, begins shortly after noon on November 19, 1969, when one Suzi Wong was addressing a group of "from 65 to 102" people, most of whom were apparently students. Defendants Kay Taus, Coffman and Prickett were in the group. Miss Wong asked the group to go with her to the cafeteria and to Brugger's office. The crowd left with Miss Wong. First there was a march through the cafeteria, then a procession to Brugger's office in Kerckhoff Hall. About 60 students crowded into the office. Among them were all five defendants. Several people in the crowd were talking at the same time, using obscenity, calling Brugger a racist and demanding that he rehire Bargaineer right then and there. When Brugger stated that he had an appointment someone said: "The hell with your appointment. Call your wife. You won't be home tonight." Dean Reeves, who was standing in the doorway to Brugger's office, was shoved away by a

female demonstrator. When he asked not to be shoved defendant Prickett came forward with drawn fists and said: "If you put your hands on her I will knock your fucking teeth out." Reeves left. At one point the demonstrators held what appeared to be a caucus. About 28 or 30 of them left, 28 or 29 remained.[1] All five defendants were among those who remained. At that point Jeffrey was identified as a "plainclothes pig" and he retired to the office of Brugger's secretary. The demonstrators then began to barricade one of the doors to Brugger's office with furniture. Defendants Prickett and Coffman were active in that operation.

There was a roof outside Brugger's office which could be reached through a french window. Defendants Coffman, Kay Taus and Arvanites were seen on the roof. Jeffrey approached Brugger's office by way of the roof and inquired about his health, having been told that Brugger had had a heart attack only a month earlier. Brugger said he was "Okay." Kay Taus then again recognized Jeffrey as a police officer and demanded that he get off the roof, threatening to shove him "through the fucking skylight" if he did not. He complied. Looking into Brugger's office he was able to see something resembling a desk against a door.

The people inside Brugger's office were using his telephone and Jeffrey listened in on an extension. At one point he heard a female voice say: "This is Kay. We are holding our Mr. Brugger. Why don't you come over?" Eventually, shortly after 8 p.m. that night, Jeffrey and other police officers forced their way into Brugger's office and arrested defendants together with 23 other persons.

Brugger's testimony was more detailed than Jeffrey's: He was seated behind his desk when numerous students entered his office at 1:15 p.m. He noted defendants Coffman, Kay Taus, Roger Taus and Prickett among them. Apart from those who were in his own office, there were others in his secretary's office and in the hall. Prickett demanded that Brugger pick up the telephone and "call the mother-fucking son of a bitch who had fired Bargaineer and to get him up [here] so that Mr. Bargaineer could get rehired." Others made similar demands. At one point when Brugger smiled he was told to "wipe that goddamn smile off his face. Kay Taus informed him that after the group got through with him he would not have anything to smile about. It was at this point that Brugger first noticed defendant Arvanites who was standing next to Kay Taus. Two members of the group told Brugger that they did not want to talk, they wanted action.

After Dean Reeves had left the room, the door was slammed shut and furniture was started to be moved. Brugger's credenza was pushed over by,

---

[1] We are aware that Officer Jeffrey's estimates of the size of the crowds are strange.

among others, defendant Coffman. When Brugger tried to go to his secretary's office to make a telephone call he was physically blocked from leaving the room by Roger Taus who said something like "that's as far as you are going." At that point the door to the secretary's office was not barricaded.

At about 4 p.m. defendant Coffman and two others asked Brugger to sign a piece of paper stating that he would rehire Bargaineer without any conditions.[2] He refused. Coffman then said, in effect, that they were going to stay until the paper was signed. At about 5 p.m. Vice Chancellor Hobson, the chief of the campus police and several other men approached Brugger's office by way of the roof. Brugger moved to join them. A group formed and jostled him back into the room. Through the window Brugger told the vice chancellor that he was still negotiating and that he had an appointment at 7 p.m. which he intended to keep. Brugger then told those inside the room that if he were kept from his 7 p.m. appointment "we'd be in an entirely different ball game." He would then consider himself kept against his will and by force.

Brugger's captors then caucused outside the room, leaving five or six of their number to guard him. When they returned Miss Wong announced that they had decided to keep Brugger there until he had signed the document with respect to Bargaineer. Up to that point Brugger was still negotiating in good faith and did not consider himself a prisoner. The students then barricaded a second door. Defendant Coffman was active in that effort. Others started to tape windows. Kay Taus was a member of that group. At about 6:55 Brugger again tried to leave the room by way of the roof. He was pushed back physically and was told that he could not leave. Coffman and Kay Taus were among those who prevented his departure. All five defendants were observed by Brugger in the room at one time or another after 7 p.m. Some time after 7 a member of the Student Council came in from the roof and was heard saying: "If he wants to leave, he should be able to leave." He was thrown out. Cries of pain emanated from the roof area. A voice said "somebody get a doctor. Somebody get an ambulance." Brugger tried to go onto the roof to see what was happening but was jostled back into the room. He then attempted to leave by way of the door leading to his secretary's office. When he tried to move the bookcase which was barricading it, he was pulled away by three students. Defendant Roger Taus was among them. An attempt to leave by way of the door that led to the hall was prevented by three persons, one of whom was defendant

---

[2]Brugger had agreed to reinstate Bargaineer with full back pay and to submit the question of the propriety of his discharge to a grievance committee. Apparently this "condition" was not acceptable. Nevertheless Brugger offered the same terms to Bargaineer by a letter written the next day. Bargaineer who had found different employment did not accept.

Prickett. Coffman then taped the paper which the students wanted signed to the wall above Brugger's head and said: "Well, you are just going to stay here until you sign it." Brugger then heard the voice of Vice Chancellor Hobson who asked him to leave the room. Again Brugger was prevented from doing so. Prickett and Coffman were involved in that effort. Brugger then heard a series of announcements made by means of bullhorns by Hobson and persons who identified themselves as police officers. The meeting in the office was declared to be an illegal assembly and the group was asked to disperse. When these commands were not obeyed the police broke in and Brugger was freed.

The defense was, in the main, legally irrelevant. Principally the defendants explained their political and socio-economic views which led them to do what they did. About the only defense testimony which touched upon the legal merits was evidence designed to minimize the amount of force used to effectuate Brugger's imprisonment and evidence from Prickett to the effect that the original purpose of the group was simply to present petitions to Brugger[3] and that the only reason why the group continued what Prickett called a "sit-in" was that Brugger seemed on the verge of granting the group's demands.

## DEFENDANTS' CONTENTIONS

Defendants claim that: 1. their convictions on the conspiracy count violate their First Amendment rights; 2. there is no substantial evidence that the false imprisonment was effected by "violence or menace" (Pen. Code, § 237) and therefore, defendants were, at most, guilty of a misdemeanor; 3. the trial court's instructions defining "violence" were erroneous; 4. with respect to defendants Kay Taus and Arvanites the record does not even justify a misdemeanor conviction; and 5. certain conditions of probation imposed by the court are improper.

## DISCUSSION

## I.

■ The point that their convictions violated defendants' First Amendment rights is based on a complete misreading of the essay[4] on conspiracy prosecutions and the First Amendment which forms the lead opinion in *Castro* v. *Superior Court,* 9 Cal.App.3d 675, 681-698 [88 Cal.Rptr. 500].

---

[3]Cross-examination of Brugger confirmed the fact that somebody in the group was carrying a stack of petitions.

[4]Since one justice dissented from the result reached in the lead opinion and another concurred merely in the result, the portion of the Castro opinion relied on has no force as precedent.

There it was said that where persons are engaged in a demonstration, legitimately designed to publicize grievances, and some of the demonstrators commit breaches of the peace, the People may not base a prosecution for conspiracy to disturb the peace on inferences derived solely from the wrongful conduct of some of the demonstrators. To equate the conduct of the group which imprisoned Brugger with a constitutionally protected demonstration seems absurd. (Cf. *Adderley* v. *Florida,* 385 U.S. 39, 46-48 [17 L.Ed.2d 149, 155-156, 87 S.Ct. 242].) Whether or not Bargaineer had been unjustly fired, defendants' and their allies' purpose in restraining Brugger of his freedom of movement was not to publicize a grievance or petition for a redress thereof, but extortion.

Defendants argue that to apply conventional conspiracy doctrines to the facts of this case exposes everyone who heard Miss Wong's speech to the danger of a conspiracy prosecution. They point to the fact that the first overt act alleged in the information is that very speech.[5] They do not explain, however, how it follows that a person who merely listened to the speech and did nothing to indicate a willingness to aid its stated objective can possibly be guilty of being Miss Wong's coconspirator.[6] The point has no merit.

## II.

Section 237 of the Penal Code provides that false imprisonment "effected by violence, menace, fraud or deceit" is punishable as a felony. The jury found that each defendant had falsely imprisoned Brugger by "violence *and* menace." (Italics added.) Defendants claim that the evidence does not support the finding. The argument runs as follows: If the word "violence" in section 237 of the Penal Code is to be read as synonymous with "force," it becomes almost impossible to visualize a false imprisonment

---

[5]Whether or not Miss Wong's speech was properly pleaded as an overt act is a fine point. There is no direct evidence of any conspiracy preceding that speech. There is, however, evidence that defendants had resented the firing of Bargaineer for some time and had been active in publicizing the grievance. It could perhaps be inferred from all the surrounding circumstances that Miss Wong's speech was not a spontaneous inspiration but part of an agreement previously reached between her and the leaders in the event that followed. We need not decide whether this argument has merit, nor whether, if it does, it necessarily applies to all defendants. Four other overt acts were alleged. The evidence with respect thereto is not in doubt, and any error in designating the speech as an overt act is obviously harmless beyond a reasonable doubt.

[6]We judicially note the fact that "demonstrations" such as took place in Brugger's office were not uncommon on campuses at the time. Miss Wong's stated purpose to go to Brugger's office could therefore be interpreted as having a sinister overtone.

which is not felonious.[7] Therefore the word "violence" must be deemed modified by the word "menace," so that only violence which threatens—menaces—physical harm will suffice to make the crime a felony. It is then argued that none of the force used on Brugger was of the type likely to cause physical harm.

We do not agree with the legal assumption. Whatever problems may exist in connection with defining the word "violence," the Legislature clearly intended the noun "menace" to have more significance than to be a mere modifier of "violence." If defendants' argument is correct "menace" loses all independent meaning and a person who effects a false imprisonment by threatening to shoot the victim if he moves, is guilty of a misdemeanor only. One of the cases cited by defendants, *People* v. *Zilbauer,* 44 Cal.2d 43, 51 [279 P.2d 534] demonstrates that such is not the law.

## III.

Defendants criticize the trial court's definitions of the word "violence" read to the jury.[8] They claim that the court defined the word to be synonymous with "force," so that the jury could find them guilty of felony false imprisonment on the basis of the gentlest of restraints applied to the victim's person.

Assuming that defendants are correct in their basic premise that section 237 of the Penal Code demands a showing of more force than the present record—or at least defendants' version of the facts—reveals, defendants' point has merit, at least in the abstract. One of the definitions of violence read to the jury was "force unlawfully exercised." There cannot be any question that defendants or those whom they aided and abetted applied illegal force on Brugger. Standing alone, the instruction, if followed, left the jury no choice but to return a felony verdict. Yet we do not see how defendants were damaged. They do not criticize the court's definition of "menace." The record is replete with evidence of menace and the jury found them guilty of having used both menace and violence. The error, if any, is therefore academic.

---

[7]Indeed, if the word "violence" is thus interpreted, then in view of the fact that the use of fraud or deceit also makes false imprisonment felonious, the only example of misdemeanor false imprisonment which comes to mind is locking the victim into a room into which he had gone unforced and unpersuaded by the defendant.

[8]"The Random House Dictionary of the English Language defines violence as 'swift and intense force: rough or injurious physical force. A violent act or proceeding: rough or immoderate vehemence.'"

"BLACK's LAW DICTIONARY defines violence as: Unjust or unwarranted exercise of force, usually with the accompaniment of vehemence, outrage or fury. Force, physical force, force unlawfully exercised, the abuse of force, that force which is employed against common right, against the laws, and against public liberty."

## IV.

■ Defendants Kay Taus and Arvanites argue that the evidence is insufficient to support their convictions on any theory. Our summary of the facts refutes the point. It is true that defendant Arvanites was not seen to have personally touched the person of Brugger, but the jury was amply justified in finding that all those who had entered the office had done so pursuant to a conspiracy to imprison Brugger and that under the circumstances of this particular case those who remained when the imprisonment became effective assisted those who were more active physically restraining Brugger through their very presence. They formed, as it were, part of a human wall. (See *People* v. *Durham,* 70 Cal.2d 171, 181-185 [74 Cal.Rptr. 262, 449 P.2d 198].)

## V.

■ As part of the conditions of probation defendants were ordered not to "plan, engage in or participate in any demonstration, picketing or sit-in," and not to "post or carry any signs or placards" nor to "hand out or distribute any leaflets or pamphlets."[9]

Defendants attack these conditions except the one relating to sit-ins. They claim that the court had no power to deprive them of First Amendment rights, that the conditions are a form of prior restraint of speech and that, in any event, the conditions are too broad.

Conditions of probation similar to those imposed on defendants were recently reviewed in *In re Mannino,* 14 Cal.App.3d 953 [92 Cal.Rptr. 880] and in *People* v. *King,* 267 Cal.App.2d 814 [73 Cal.Rptr. 440]. In *Mannino* the court accepted the criteria of *People* v. *Dominguez,* 256 Cal.App.2d 623, 627 [64 Cal.Rptr. 290]: "A condition of probation which (1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality does not serve the statutory ends of probation and is invalid."

Since the crimes of which the defendants in *Mannino* and *King* were convicted were not the same as those committed by defendants in the case at bar, the appellate dispositions of the claims of invalidity in those cases are not necessarily controlling here. In *King* the defendant had been found

---

[9]A further condition that defendants "[n]ot enter upon the campus, grounds or buildings of the University of California at Los Angeles or any other educational institution unless enrolled as a student or employed by such institution" appears invalid on the authority of *In re Mannino,* 14 Cal.App.3d 953, 965 [92 Cal.Rptr. 880]. Defendants, however, do not attack this condition.

guilty of simple assault (Pen. Code, § 240) although the evdience showed that she had committed batteries on police officers during a demonstration. She was placed on probation on condition that she not "participate actively in demonstrations involving sit-down, road blocking, et cetera." Three months later probaton was revoked after she had participated in a demonstration at UCLA. Apparently the demonstration was entirely peaceful (*People* v. *King, supra,* 267 Cal.App.2d at pp. 825-826) and the extent of the defendant's proven participation was that she blew up balloons which the demonstrators were carrying. The order was affirmed.

Mannino had been convicted of assault with force likely to produce great bodily harm (Pen. Code, § 245) after he had severly kicked and beaten his victim during an unauthorized demonstration at the College of San Mateo, during which Mannino had delivered a speech. The record also showed that he had been convicted of various misdemeanors resulting from his political activities and that on at least one occassion he had kicked campus police with heavy boots. The conditions of probation imposed by the trial court were aptly summarized by it as "putting the gag" on Mannino. They need not be set forth in detail. After an extensive review of applicable law, the appellate court invalidated the following conditions:

1. A prohibition against passive membership in organizations which participate in or advocate any form of protest or change in existing conditions. 2. A prohibition against writing for school or college publications. 3. A prohibition against membership on the staff of any such publication. 4. A prohibition against entering any campus except one where defendant was enrolled as a student. 5. A prohibition against being an advisor to a planned demonstration of any kind; and 6. A prohibition against "passive participation" in a demonstration, whatever that term may mean.

The court, in *Mannino,* did not say, as defendants would have us say, that any condition of probation which infringes on First Amendment rights is automatically invalid. Instead it analogized the criteria for valid infringements on First Amendment rights to those we look to when a publicly conferred benefit is conditioned on a waiver of constitutional rights: "(1) that the conditions reasonably relate to the purposes sought by the legislation which confers the benefit; (2) that the value accuring to the public from imposition of those conditions manifestly outweighs any resulting impairment of constitutional rights; and (3) that there are available no alternative means less subversive of constitutional right, narrowly drawn so as to correlate more closely with the purposes contemplated by conferring the benefit. . . ." (*Parrish* v. *Civil Service Commission,* 66 Cal.2d 260, 271 [57 Cal.Rptr. 623, 425 P.2d 223].) Thus, in view of the nature of Mannino's past conduct the court left intact several conditions to his pro-

bation which unquestionably deprived him of the exercise of constitutional rights.[10]

Applying the teaching of *Mannino* and *King* to the case at bar we hold: the prohibition against planning and engaging[11] in demonstrations is valid. The defendants' own testimony in the case at bar, in which they demonstrated a total lack of regret for their actions, entitled the trial court to believe that any demonstration planned or engaged in by them would turn into a repetition of their conduct on November 19, 1969. The condition related directly to the crime of which they were convicted and forbade conduct reasonably related to future criminality. (*People* v. *Dominguez, supra,* 256 Cal.App.2d at p. 627.) The result, different from that reached in *Mannino,* with respect to planning demonstrations is, of course, justified by the fact that defendants were convicted of conspiracy.

■ On the other hand the prohibition against planning or engaging in picketing, posting or carrying signs or placards and handing out or distributing leaflets or pamphlets is too sweeping. Of course, to the extent that defendants may enage in such activities as part of a demonstration, the condition prohibiting them from planning or engaging in demonstrations encompasses the activities now under·discussion and a further prohibition seems unnecessary. The order, however, goes much further. It encompasses any attempt by defendants to disseminate any idea by means of picketing, signs, placards, leaflets or pamphlets, even if the particular defendant acts entirely on his own. Obviously many of the perfectly legal activities covered by these further prohibitions may have no relationship whatever to the crime of which defendants have been convicted and may be not at all related to further criminality. (*People* v. *Dominguez, supra,* 256 Cal.App.2d at p. 627.) To take extreme examples: a defendant who favors or opposes the legalization of abortion or the fluoridation of drinking water, would be unable to air his views by any of the prohibited means; he could not post campaign stickers during any election campaign or stand alone at a street corner with a picket sign advocating clean air.

We do not hold that the conditions of probation must be limited to group action. We visualize the possibility that certain individual activities, otherwise protected by the First Amendment, may pass muster under the *Dominguez-Mannino* test. ■ We merely say that a condition of probation which prohibits conduct which is not only legal, but protected by the Con-

---

[10]No useful purpose would be served by detailing what was left of the trial court's order prescribing the conditions of Mannino's probation. Since his conduct differed significantly from that of defendants, conditions valid in his case might be invalid·in the case at bar and vice versa.

[11]We see no difference between engaging in a demonstration and participating in it.

stitution and not related to the crimes of which a defendant has been convicted, nor to future criminality, cannot stand.

The superior court is directed to modify the order granting probation in accordance with the views set forth in this opinon. In all other respects the judgments (orders granting probation) are affirmed.

Stephens, J., and Reppy, J., concurred.

A petition for a rehearing was denied June 11, 1971, and appellants' petition for a hearing by the Supreme Court was denied July 28, 1971.