[No. AO17295. First Dist., Div. Two. Feb. 17, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
RUBY POINTER, Defendant and Appellant.

COUNSEL

Howard J. Berman, under appointment by the Court of Appeal, and Berman & Glenn for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Thomas A. Brady, Ann Jensen and Linda Ludlow, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**KLINE, P. J.**—Our principal inquiry in this case is whether a woman convicted of the felony of child endangerment (Pen. Code, § 273a, subd. (1)) and found to be in violation of a custody decree (§ 278.5)[1] may, as a condition of probation, be prohibited from conceiving a child. As a preliminary matter, we must also determine whether section 273a, subdivision (1), defines a specific intent crime.

## I.

Appellant, Ruby Pointer, has at all material times been the devoted adherent of a rigorously disciplined macrobiotic diet.[2] She is also the mother of two children, Jamal and Barron, who at the time of trial were, respectively, two and four years of age. Appellant imposed an elaborate macrobiotic regime on both children despite the objections of Barron's father and

---

[1] All statutory references are to the Penal Code unless otherwise specified.

[2] At trial a macrobiotic diet was described by appellant's physician as follows: "Macrobiotic, as it's usually used, refers to a diet that is pretty much exclusively grains, beans and vegetables, meaning pretty much excluding fruits, deemphasizing salads, deemphasizing or eliminating milk products of all form, yogurt, milk, cheese, cottage cheese and, also, no fish, meat, poultry or eggs. Pretty narrow diet."

despite the repeated advice of her physician, Dr. Gilbert Carter, that such diet was inappropriate and unhealthy for young children. Dr. Carter additionally advised appellant that breastfeeding Jamal while she was herself on a macrobiotic diet was hazardous for the infant.

In October 1980, more than a year prior to the trial, Barron's father sought the assistance of Children's Protective Services, a county agency that investigates complaints of child abuse and neglect. Donald Allegri, a social worker with the agency, thereupon met with appellant and, after seeing the children, strongly urged her to immediately consult Dr. Loretta Rao, a pediatrician. Appellant brought Barron to Dr. Rao for examination, but not Jamal. Upon learning that Jamal had not been examined by Dr. Rao, Allegri phoned appellant's regular physician, Dr. Carter, and expressed his deep concern over Jamal's condition.

On November 8, 1980, Dr. Carter spent nearly two hours with appellant and both children. He was shocked when he observed Jamal and stated "God, Ruby, God, how could you do this? How could you not take care of your baby?" Dr. Carter reiterated the dangers of breastfeeding Jamal while she was on a macrobiotic diet, importuned her to modify her own diet and recommended increased calories and protein for the child. Dr. Carter also urged her to consult Dr. Rao, who, because she was herself a vegetarian, he thought might be able to more strongly influence appellant. Appellant disregarded Dr. Carter's advice and at this time did not consult Dr. Rao.

Two days later Dr. Carter again saw appellant and Jamal and observed that the child remained malnourished and significantly underdeveloped. He again pressed appellant to visit Dr. Rao and she again declined to do so. During a telephone conversation nearly two weeks later, Dr. Carter repeated his warning of the severity of Jamal's condition and urged appellant once more to visit Dr. Rao or, in the alternative, bring the child to a hospital emergency room. Appellant vaguely indicated that she would "take care of things."

When on November 25th appellant finally brought Jamal to Dr. Rao she was informed that the child, who was emaciated, semicomatose, and in a state of shock, was dying and in need of immediate hospitalization. Appellant demurred, telling Dr. Rao that she wanted to consult others and would return later. Appellant resisted hospitalization because she felt Jamal might intravenously be fed "preservatives" and suffer a rash. Dr. Rao thereupon called the police, who arrived in five minutes and ordered Jamal hospitalized at once. As a result of emergency procedures the child's life was saved.

During Jamal's hospitalization, appellant surreptitiously brought him macrobiotic food despite warnings not to do so and continued to breastfeed

him even after being told that her milk contained high levels of sodium that endangered the child.

Upon his discharge from the hospital, Jamal was placed in a foster home. While ostensibly visiting him there, appellant abducted the child and fled to Puerto Rico with him and her other son. An agent of the Federal Bureau of Investigation located appellant and the children in a housing project in Rio Piedras, Puerto Rico, on September 29, 1981, and arrested her at that time. The agent testified at trial that appellant's living quarters were rather squalid and that the only foodstuffs he observed were bags of beans, some millet, a few other grains and noodles. After appellant waived her *Miranda* rights, she admitted to the agent that she had abducted Jamal from the foster home. She did so, she stated, because the woman who managed the home fed Jamal eggs and sugar and did not respect his dietary habits. She said Jamal was "getting fat" and that she did not like it.

When the children returned to California it was determined that as a result of diet and maternal neglect Barron was seriously underdeveloped and Jamal had suffered severe growth retardation and permanent neurological damage.

On the facts just briefly described, appellant was found guilty by a jury of violation of Penal Code sections 273a and 278.5. She was thereafter sentenced to five years probation on the conditions that she serve one year in county jail; participate in an appropriate counseling program; not be informed of the permanent whereabouts of Jamal (who was placed in foster care) and have no unsupervised visits with him; have no custody of any children, including her own, without prior court approval; and that she not conceive during the probationary period. Appellant challenges this last condition as an unconstitutional restriction of her fundamental rights to privacy and to procreate.

## II.

Before addressing the propriety of the challenged condition we turn first to the threshold question whether the trial court correctly refused appellant's requested instruction that section 273a, subdivision (1), requires the specific intent to injure the child.[3]

---

[3]Section 273a provides in pertinent part as follows: "(1) Any person who, under circumstances or conditions likely to produce great bodily harm or death, . . . willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of such child to be injured, or willfully causes or permits such child to be placed in such situation that its person or health is endangered, is punishable by imprisonment in the county jail not exceeding one year, or in the state prison for 2, 3 or 4 years."

After reading the pertinent part of section 273a, subdivision (1), to the jury, the court instructed the jury on the elements required to commit the crime.[4]

The court then proceeded to define the term "willful" as follows: "As used in these instructions, the word 'willful' is construed to mean the intentional placing of a child, or permitting him to be placed, in a situation in which serious physical danger or health hazard to the child is reasonably foreseeable. [¶] It implies simply a purpose or willingness to commit the act or make the omission referred to. It does not require any intent to violate law or to injure the child."

Appellant's contention that it was error not to instruct the jury that a violation of the statute requires the specific intent to inflict the harm defined in the statute has no support in law. ■ It is well established that the term "willful" as utilized in section 273a, subdivision (1), does not require intent to injure the child but "'. . . implies simply a purpose or willingness to commit the act, or make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage.'" (*People* v. *Atkins* (1975) 53 Cal.App.3d 348, 358 [125 Cal.Rptr. 855], quoting Penal Code section 7, subdivision (1); see also, *People* v. *Peabody* (1975) 46 Cal.App.3d 43, 46 [119 Cal.Rptr. 780]; and *People* v. *Beaugez* (1965) 232 Cal.App.2d 650, 657 [43 Cal.Rptr. 28].)

■ As set forth in *Peabody, supra,* the standard of conduct condemned by the statute is that of criminal negligence, which means "that the defendant's conduct must amount to a reckless, gross or culpable departure from the ordinary standard of due care; it must be such a departure from what would be the conduct of an ordinarily prudent person under the same circumstances as to be incompatible with the proper regard for human life. [Citations.]" (46 Cal.App.3d at pp. 48-49.) This construction of the statute was recently reaffirmed in *People* v. *Northrop* (1982) 132 Cal.App.3d 1027

---

[4]The court instructed the jury as follows: "In order to prove the commission of such crime, each of the following elements must be proved. [¶] That, number one, under circumstances likely to produce great bodily injury or death; [¶] Number two, the defendant willfully caused or permitted; [¶] Number three, the health of the child to be injured; [¶] Number four, while the defendant had the care or custody of the child. . . . [¶] That which is reasonably foreseeable requires the knowledge of the consequences of the act or omission. [¶] Penal Code Section 273(1) requires proof of criminal negligence which means that the defendant's conduct must amount to a reckless, gross or culpable departure from the ordinary standard of due care. It must be such a departure from what would be the conduct of an ordinarily prudent person under the same circumstances as to be incompatible with a proper regard for human life. Proof of mere inattention or mistaken judgment is insufficient to support criminal conviction. [¶] In the crime charged in Count I of the Information, that is, the violation of Penal Code Section 273a(1), which I just discussed, there must exist a union or joint operation of fact or conduct and criminal negligence."

[132 Cal.Rptr. 1027], in which, in the course of approving an instruction similar to that challenged here, the court recognized that "[I]t would have been error for the trial court to apply the specific intent instruction to the child abuse count [§ 273a, subd. (1)], since felony child abuse is a general intent crime. [Citations.]" (*Id.*, at p. 1037.)

*In re Maria R.* (1976) 64 Cal.App.3d 731 [135 Cal.Rptr. 2], and *People* v. *Hernandez* (1980) 111 Cal.App.3d 888 [168 Cal.Rptr. 898], upon which appellant relies, are not inconsistent with the foregoing cases. *Maria R.* was a juvenile proceeding involving a 16-year-old minor who was the mother of two children. The petition filed in the case alleged that Maria was within section 602 of the Welfare and Institutions Code in that she had abused one of her children in violation of subdivision (1) of section 273a. Since the matter was a juvenile proceeding, the propriety of jury instructions was not at issue. The only question presented on appeal was whether there was substantial evidence to support the order sustaining the petition. In holding that the evidence was insufficient, the Court of Appeal stated that "[a]t most, it shows only that Maria was ignorant of the potentially adverse effects of administering aspirin to a small child. That is not the 'purposeful' conduct or the conduct 'with knowledge of consequences' of which [*People* v.] *Beaugez* [*supra*, 232 Cal.App.2d 650] speaks." (*Id.*, at p. 735.) In short, the court in *Maria R.* distinguished the facts in that case from those in *Beaugez* and *People* v. *Peabody, supra*; it did not disapprove the holdings in those or other cases that section 273a, subdivision (1), defines a general intent crime.[5]

*People* v. *Hernandez, supra,* 111 Cal.App.3d 888, also does not address the question whether section 273a defines a general or specific intent crime. Like *In re Maria R.*, the case was tried by the court without a jury (so that there was no claim of improper jury instructions) and the principal issues on appeal related to the adequacy of the evidence to support the judgment.

For the foregoing reasons, we reaffirm the recent holding in *People* v. *Northrop, supra,* and the earlier cases upon which it relies, that it would have been error for the trial court to instruct the jury that section 273a, subdivision (1), requires specific intent to inflict the harm referred to in the statute.

---

[5]We are aware that in reaching its evidentiary conclusion, the *Maria R.* court noted in passing that "Section 273a requires that the person charged thereunder 'willfully' intend to cause the results listed in that section, instead of the lesser requirement that the person charged 'willfully' intend only the doing of an act (or the omission of an act) that, in fact, results in any of those consequences." (*Id.*, at p. 734.) To the extent that this statement, which was not necessary to the result, is inconsistent with the holdings in *People* v. *Atkins, supra*; *People* v. *Northrop, supra*; *People* v. *Peabody, supra*; and *People* v. *Beaugez, supra*, we decline to follow it.

## III.

The condition of probation prohibiting conception, to which we now turn, was imposed only after thoughtful consideration by the trial judge, who fully appreciated the extraordinary nature of his action. As he stated at the sentencing hearing, "I have never considered imposing as a condition of probation the requirement that someone not conceive during the period of probation, and I have never considered requiring as a condition of probation that a defendant not have custody of her children without approval by the sentencing court following a hearing, but that's certainly what I intend to do in this case. This is an extremely serious case."

This assessment is supported by the record. The lengthy probation report repeatedly emphasized appellant's denial of responsibility for her actions and inability or unwillingness to alter her conduct, as well as the high likelihood that, if permitted to do so, she would in the future continue to endanger the health and indeed the lives of her children. Though the report expressed the view that appellant's understanding and acceptance of responsibility would not be enhanced by incarceration in prison and did not recommend a state prison term, it did point out that such confinement would at least prevent appellant from "interfering or attempting to interfere in the treatment and special education of her sons and that she will also not become pregnant and endanger another small child in the future."

In this connection, Dr. Barbara O. Murray, a psychologist who examined appellant at the direction of the court, reported that appellant "is extremely reluctant to take any forms of chemicals or medication [and] . . . would not comply with such a requirement if it were imposed. Thus, if required to take birth control pills, for example, it first of all would be extremely difficult to monitor or supervise such a condition, and the likelihood of noncompliance would be inordinately high. Thus, if such an alternative is ultimately considered desirable by the court, it might be more advisable simply to incarcerate her now rather than wait for her to violate probation." Dr. Murray also concluded that "[a]ny new born child to Ms. Pointer would encounter similar risks as those of her previous children." This conclusion is consistent with the views of Dr. Rao, who stated that appellant suffers "an altered state of reality" that can not easily be reformed.

██ "Under [Penal Code section 1203.1] a sentencing court has broad discretion to describe conditions of probation to foster rehabilitation and to protect the public to the end that justice may be done. (*People* v. *Richards* (1976) 17 Cal.3d 614, 619 . . .; *In re Martinez* (1978) 86 Cal.App.3d 577,

580 . . .; *People* v. *Keller* (1978) 76 Cal.App.3d 827, 831 . . . .)"[6] However, " 'The discretion granted is not boundless. In the first place, the authority is wholly statutory; the statute furnishes and limits the measure of authority which the court may thus exercise [citations]. [¶] Secondly, the discretion to impose conditions of probation as granted by Penal Code section 1203.1 is further circumscribed by constitutional safeguards. Human liberty is involved. A probationer has the right to enjoy a significant degree of privacy, or liberty, under the Fourth, Fifth and Fourteenth Amendments to the federal Constitution [citations].' (*People* v. *Keller, supra,* 76 Cal.App.3d 827 at p. 832.)" (*In re White* (1979) 97 Cal.App.3d 141, 145-146 [158 Cal.Rptr. 562]. See also, Weissman, *Constitutional Primer on Modern Probation Conditions* (1982) 8 New Eng. J. Prison L. 367 and Greenberg, *Probation Conditions and the First Amendment: When Reasonableness is Not Enough* (1981) 17 Colum. J. L. & Soc. Probs. 45.)

At the same time it is recognized that the government may impose conditions of probation which qualify or impinge upon constitutional rights when circumstances inexorably so require. (See *People* v. *Arvanites* (1971) 17 Cal.App.3d 1052, 1063 [95 Cal.Rptr. 493] [upholding a probation condition prohibiting planning and engaging in demonstrations]; see also, *In re Mannino* (1971) 14 Cal.App.3d 953, 966-969 [92 Cal.Rptr. 880, 45 A.L.R.3d 996]; cf. *Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 505 [55 Cal.Rptr. 401, 421 P.2d 409].)[7]

---

[6]Section 1203.1 provides in pertinent part: "The court . . . in the order granting probation, may suspend the imposing, or the execution of the sentence . . . upon such terms and conditions as it shall determine. [¶] The court may impose and require any . . . *reasonable* conditions, as it may determine are fitting and proper to the end that justice may be done, that amends may be made to society for the breach of the law, for any injury done to any person resulting from such breach generally and specifically for the reformation and rehabilitation of the probationer, . . ." (Italics added.)

[7]It is at this juncture appropriate to acknowledge the existence of a long line of federal and state cases, commencing for the most part with *Escoe* v. *Zerbst* (1935) 295 U.S. 490 [79 L.Ed. 1566, 55 S.Ct. 818], declaring that probation is not a matter of right but a "privilege" or "act of grace" or "act of clemency." (See, e.g., *Earnest* v. *Willingham* (10th Cir. 1969) 406 F.2d 681, 682; *People* v. *King* (1968) 267 Cal.App.2d 814, 822 [73 Cal.Rptr. 440]; *State* v. *Donovan* (1977) 116 Ariz. 209, 212 [568 P.2d 1107, 1110]; and *Edwards* v. *State* (1976) 74 Wis.2d 79, 83 [246 N.W.2d 109, 110, 99 A.L.R.3d 960].) This characterization of probation has repeatedly been advanced as a reason, usually among others, to indulge the discretion of a sentencing court to impose conditions that limit constitutional rights. (See, e.g., *United States* v. *Kohlberg* (9th Cir. 1973) 472 F.2d 1189, 1190, quoting *United States* v. *Chapel* (9th Cir. 1970) 428 F.2d 472, 474, and *People* v. *King, supra,* 267 Cal.App.2d at p. 822.) The theory suggests that, since a sentencing court may completely withhold the benefit of probation, it should therefore be permitted to encumber the benefit with even the most extreme conditions. Although some reviewing courts continue to give lip service to this theory (see, e.g., *People* v. *Beach* (1983) 147 Cal.App.3d 612, 613 [195 Cal.Rptr. 381]), it was repudiated more than a decade ago by the United States Supreme Court. As stated by the high court in *Gagnon* v. *Scarpelli* (1973) 411 U.S. 778 [36 L.Ed.2d 656, 93 S.Ct. 1756], "[i]t is clear at least after *Morrissey* v. *Brewer* 408 U.S. 471 (1972), that a probationer can no longer be denied due process in reliance on the dictum

■ The validity of the condition of probation with which we are here concerned must first be assessed in terms of its reasonableness. ■ The test of the reasonableness of a condition of probation was in this jurisdiction first prescribed in the landmark case of *People* v. *Dominguez* (1967) 256 Cal.App.2d 623, 627 [64 Cal.Rptr. 290], which was followed by the Supreme Court in *People* v. *Lent* (1975) 15 Cal.3d 481, 486 [124 Cal.Rptr. 905, 541 P.2d 545], and states as follows: "A condition of probation will not be held invalid unless it '(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality . . . . [Citation.]"[8] (See *In re White, supra,* 97 Cal.App.3d 141, 146.)

■ Applying this test to the facts of the instant case, we conclude that the condition in question is reasonable. Unlike *Dominguez,* where the court found a similar condition invalid because the defendant's future pregnancy was unrelated to the crime of robbery and had no reasonable relation to future criminality *(id.,* at p. 627), in this unusual case the condition is related to child endangerment, the crime for which appellant was convicted. Although cases in other jurisdictions have concluded that a condition of probation that a defendant not become pregnant has no relation to the crime of child abuse or to future criminality *(Rodriguez* v. *State* (1979 Fla.App.) 378 So.2d 7; *State* v. *Livingston* (1976) 53 Ohio App.2d 195 [7 Ohio Ops.3d 258, 372 N.E.2d 1335, 94 A.L.R.3d 1213]), those cases relied heavily upon the fact that the abuse could be entirely avoided by removal of any children from the custody of the defendant. This case is distinguishable, however, because of evidence that the harm sought to be prevented by the trial court may occur before birth.[9] Since the record fully supports the trial court's belief that appellant would continue to adhere to a strict macrobiotic diet despite the dangers it presents to any children she might conceive, we can-

---

in *Escoe* v. *Zerbst,* 295 U.S. 490, 492 (1935), that probation is an 'act of grace.'" *(Id.,* at p. 782, fn. 4 [36 L.Ed.2d at p. 662].) (See also, *United States* v. *Consuelo-Gonzalez* (9th Cir. 1975) 521 F.2d 259, 265.)

[8] In paraphrasing the foregoing quotation from *Dominguez* in *In re Bushman* (1970) 1 Cal.3d 767, 777 [83 Cal.Rptr. 375, 463 P.2d 727], and *People* v. *Mason* (1971) 5 Cal.3d 759, 764 [488 Cal.Rptr. 630], the Supreme Court "inadvertently" stated the test in the disjunctive rather than the conjunctive. To this extent the court in *Lent* disapproved *Bushman* and *Mason.* (15 Cal.3d at p. 486, fn. 1.)

[9] The trial court's concern that appellant's dietary practices could cause severe damage to conceived but unborn children is also justified by well established and undisputed scientific evidence. "All stages of growth and development of the fetus and placenta are influenced by nutrition. The relationship between the diet prior to and during pregnancy and the physical condition of the infant has been well documented." (Jensen et al., Maternity Care: The Nurse and the Family (1977), p. 175. See also, Aebi & Whitehead, Maternal Nutrition During Pregnancy and Lactation (1980) and Shanklin & Hodin, Maternal Nutrition and Child Health (1979).)

not say that the condition of probation prohibiting conception is completely unrelated to the crime for which appellant was convicted or to the possibility of future criminality.

Our determination that the condition of probation is reasonably related to the offense of which appellant was convicted and to possible future criminality, which are the factors measured by the *Dominguez* test, does not, however, end our inquiry. ▮ For where a condition of probation impinges upon the exercise of a fundamental right and is challenged on constitutional grounds we must additionally determine whether the condition is impermissibly overbroad.[10]

▮ There is, of course, no question that the condition imposed in this case infringes the exercise of a fundamental right to privacy protected by both the federal and state constitutions. (See *Roe* v. *Wade* (1973) 410 U.S. 113 [35 L.Ed.2d 147, 93 S.Ct. 705]; *Griswold* v. *Connecticut* (1965) 381 U.S. 479 [14 L.Ed.2d 510, 85 S.Ct. 1678]; see also Cal. Const., art. I, § 1.) ▮ Nor is there any question that for this reason the condition must be subjected to special scrutiny to determine whether the restriction is entirely necessary to serve the dual purposes of rehabilitation and public safety. (See *People* v. *Keller, supra,* 76 Cal.App.3d at 839 and *United States* v. *Consuelo-Gonzalez, supra,* 521 F.2d 259, 265.) ▮ " 'Where a condition of probation requires a waiver of precious constitutional rights, the condition must be narrowly drawn; to the extent it is overbroad it is *not* reasonably related to the compelling state interest in reformation and rehabilitation and is an unconstitutional restriction on the exercise of fundamental constitutional rights.' (*People* v. *Mason* (1971) 5 Cal.3d 759, 768 . . .; *In re Allen* (1969) 71 Cal.2d 388, 391 . . . .)" (*In re White, supra,* 97 Cal.App.3d 141, 146; see *People* v. *Keller, supra,* at p. 838.) ▮ ▮ ▮ ▮ ▮ "If available alternative means exist which are less violative of a constitutional right and are narrowly drawn so as to correlate more closely with the purpose contemplated, those alternatives should be used (*People* v. *Arvanites, supra,* 17 Cal.App.3d 1052, 1062, applying by analogy the test of *Parrish* v. *Civil Service Commission* (1967) 66 Cal.2d 260, 271 . . .)." (*In re White, supra,* 97 Cal.App.3d 141, 150.)[11] (See also,

---

[10]So too, in some cases, may it be necessary to determine whether the condition is impermissibly vague. (See, e.g., *United States* v. *Dane* (9th Cir. 1977) 570 F.2d 840, 843, cert. den., 436 U.S. 959 [57 L.Ed.2d 1124, 98 S.Ct. 3075]; and *United States* v. *Bonanno* (N.D. Cal. 1978) 452 F.Supp. 743, affd. mem., 595 F.2d 1229 (9th Cir. 1979).

[11]The criteria for determining whether the qualification of a constitutional right may properly be imposed that are set forth in the seminal case of *Parrish* v. *Civil Service Commission* (1967) 66 Cal.2d 260 [57 Cal.Rptr. 623, 425 P.2d 223], are as follows: "When . . . the conditions annexed to the enjoyment of a publicly conferred benefit require a waiver of rights secured by the Constitution, however well-informed and voluntary that waiver, a governmental entity seeking to impose those conditions must establish: (1) that the conditions

*Higdon* v. *United States* (9th Cir. 1980) 627 F.2d 893, 898; *United States* v. *Patterson* (5th Cir. 1980) 627 F.2d 760, 761, cert. den., 450 U.S. 925 [67 L.Ed.2d 354, 101 S.Ct. 1378]; and *United States* v. *Smith* (5th Cir. 1980) 618 F.2d 280, 282, cert. den., 449 U.S. 868 [66 L.Ed.2d 87, 101 S.Ct. 203].

■■■ The challenged condition was apparently not intended to serve any rehabilitative purpose but rather to protect the public by preventing injury to an unborn child. We believe this salutary purpose can adequately be served by alternative restrictions less subversive of appellant's fundamental right to procreate. Such less onerous conditions might include, for example, the requirement that appellant periodically submit to pregnancy testing; and that upon becoming pregnant she be required to follow an intensive prenatal and neonatal treatment program monitored by both the probation officer and by a supervising physician. If appellant bears a child during the period of probation it can be removed from her custody and placed in foster care, as was done with appellant's existing children, if the court then considers such action necessary to protect the infant.

Though at the sentencing hearing the prosecutor claimed that the probation department and the local children's protective services agency lacked the resources for such intensive probation supervision, there is no evidence on this issue before us. Nor does the record or common sense provide any reason to believe it would be any more difficult to determine whether appellant is pregnant for purposes of enforcing prenatal care requirements than it would be to determine whether she is pregnant for purposes of enforcing the condition here challenged. Indeed, in at least one critical respect we believe it would be *less* difficult; and the reason relates to another troublesome aspect of the challenged condition.

Although the trial judge stated at the sentencing hearing that he would not order appellant to have an abortion if she became pregnant, he also stated that "If she violates probation in this case, I would be sending her to prison; I can assure you of that. I expect her to live up to every single, solitary term and condition of probation." This stern admonition doubtless made it apparent to appellant that in the event she became pregnant during the period of probation the surreptitious procuring of an abortion might be the only

---

reasonably relate to the purposes sought by the legislation which confers the benefit; (2) that the value accruing to the public from imposition of those conditions manifestly outweighs any resulting impairment of constitutional rights; and (3) *that there are available no alternative means less subversive of constitutional right, narrowly drawn so as to correlate more closely with the purposes contemplated by conferring the benefit.*" (*Id.*, at p. 271, italics added.) The application of these criteria to test the validity of a condition of probation challenged on constitutional grounds appears to have been initiated by Justice Sims in *In re Mannino, supra,* 14 Cal.App.3d 953, 968.

practical way to avoid going to prison. A condition of probation that might place a defendant in this position, and, if so, be coercive of abortion, is in our view improper.

In any event, the dilemma that might well confront appellant if she conceived in violation of the condition imposed[12] renders it unlikely she would voluntarily reveal any pregnancy. Less restrictive conditions aimed at protecting the child in utero and after birth would not so clearly induce resistance to the disclosure of pregnancy. To this extent, less restrictive alternative conditions would be easier to monitor and enforce and therefore better protect against the harm sought to be avoided by the trial court.

We conclude that the condition of probation prohibiting conception is overbroad, as less restrictive alternatives are available that would feasibly provide the protections the trial court properly believed necessary. In order to provide the trial court an opportunity to devise a specific alternative condition or conditions we reverse only that portion of the judgment prohibiting conception as a condition of probation and remand for resentencing consistent with the views herein expressed. In all other respects the judgment is affirmed.

Miller, J., and Smith, J., concurred.

A petition for a rehearing was denied March 16, 1984, and respondent's petition for a hearing by the Supreme Court was denied April 26, 1984.

---

[12]It deserves to be noted that the condition imposed did not include a prohibition on sexual intercourse. As the trial judge stated at the sentencing hearing: "I would never require somebody to have no sexual activity; I don't think that's even suggested." The conceded fact that even the best birth control measures sometimes fail raises the possibility that appellant could conceive despite reasonable precautions to comply with the condition imposed. This might also occur if, as defense counsel pointed out at the time of sentencing, appellant reasonably relied on a sex partner's false representation that he had undergone a vasectomy.